IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

Nos. 97-41055 & 97-41152

---

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

versus

URI SHEINBAUM,

                                        Defendant-Appellant.

*********************************************************

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

versus

MARC A. BIRNBAUM,

                                        Defendant-Appellant.

---

Appeals from the United States District Court
For the Eastern District of Texas

---
February 27, 1998

Before GARWOOD, JOLLY, and HIGGINBOTHAM, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

    Defendants Uri Sheinbaum and Marc Birnbaum each pled guilty to one count of conspiracy to defraud the government and to commit bankruptcy fraud. They now appeal both the sentence and the restitution order that the district court imposed upon them. We affirm.

I.

Birnbaum and Sheinbaum were principals in various entities that were partners in a limited partnership known as 5555 Apartments, Ltd. In 1984, the partnership obtained a $10.2 million loan from Alice Savings & Loan Association to purchase an apartment complex in Dallas, Texas, called the 5555 Apartments. The terms of the Promissory Note negotiated between the parties provided for a deferred downpayment of $1.7 million, with the first installment of $237,500 due in October 1985 and the remaining principal and accrued interest due in October 1994. Birnbaum and Sheinbaum were not personally liable under the Note. Securing the Note instead were a deed of trust, a security agreement, and an assignment of rents. The security language in the Note read as follows:

> THIS DEED OF TRUST, SECURITY AGREEMENT AND ASSIGNMENT OF RENTS is made . . . FOR THE PURPOSE of securing payment of the indebtedness . . . .
> TO SECURE the full and timely payment of the indebtedness . . . Grantor has ASSIGNED . . . (f) all revenues, income, rents, issues and profits of any of the Land, Improvements, personal property or Leases (collectively, the "Rents") . . . .
> V.   Assignment of Rents: Grantor does hereby absolutely and unconditionally assign, transfer and convey to Beneficiary, as well as to Trustee on Beneficiary's behalf, all Rents under the following provisions:
> 1.   Grantor reserves the right, unless and until an Event of Default occurs under this Deed of Trust, to collect such rents as a trustee for the benefit of Beneficiary, and Grantor shall apply the Rents so collected in the order set forth in paragraph 7 of Section III hereof.
> 2.   Upon an Event of Default, Beneficiary, or Trustee on Beneficiary's behalf, may at any time and without notice, either in person, by agent or by receiver to be appointed by a court, enter and take possession of the Property or any part thereof and in its own name sue for or otherwise collect the Rents.

The partnership made the first $237,500 installment on the deferred downpayment in November 1985.

2

In October 1987, the parties to the Note renegotiated its terms and executed a written Modification Agreement. The Agreement provided that all rents and income from the apartment complex were to be placed into a separate account to be used to pay off expenses and indebtedness. It stated:

> Grantor shall maintain a special account . . . into which all income derived from all sources in connection with the operation of the Property . . . shall be deposited by Grantor, and against which checks shall be drawn only for the payment of the sums becoming due and payable under the terms of the Note or this Deed of Trust and for the payment of the necessary and reasonable expenses incurred by Grantor in connection with the operation of the Property, with such latter payments being made directly to the persons or entities providing the goods or services for which such expenses are incurred.

By 1994, the ownership of the Note had passed to Banker's Trust Company of California. In September 1994, Birnbaum and Sheinbaum decided to default on their debt payments while retaining the income from the apartments for themselves. By withholding the apartments' income, they hoped to force Banker's Trust to renegotiate the terms of the Note. To aid them in this scheme, the defendants obtained the assistance of Gail Cooper, a financial consultant who had also helped the defendants to renegotiate the Note in 1987.

On January 30, 1995, Banker's Trust sued Sheinbaum and Birnbaum in Texas state court, seeking an accounting of all rents collected since default. On February 27, 1995, before an accounting could be completed, Birnbaum filed a petition in Bankruptcy Court for the Northern District of Texas, seeking relief for 5555 Apartments, Ltd. under Chapter 11.

As part of the bankruptcy proceedings, Birnbaum and Sheinbaum were required to disclose all payments made to "insiders" of 5555 Apartments, Ltd. in the year preceding the bankruptcy filing. On March 22, 1995, the defendants filed a Statement of Financial Affairs in the bankruptcy court. The Statement revealed that $498,995 had been paid to insiders in the year prior to the bankruptcy petition, $134,000 of which had gone to Birnbaum and Lawrence Lambert, a business partner. The Statement asserted that the other $364,995 had been paid to an entity controlled by Sheinbaum as repayment for a debt owed to him by 5555 Apartments, Ltd. The Statement claimed that this debt had arisen from Sheinbaum's personal contribution towards the November 1985 payment of the first $237,500 installment on the Note. In fact, Sheinbaum's debt had long since been repaid. Sheinbaum and Birnbaum later repeated this false statement in an Amended Statement of Financial Affairs, under oath at a creditors' meeting, and in a deposition.

On June 21, 1996, the government charged Sheinbaum, Birnbaum, Cooper, and Lambert in a four-count indictment. In February 1997, Sheinbaum and Birnbaum pled guilty to count one of the indictment, charging them with conspiracy to defraud the government and to commit bankruptcy fraud. The district court sentenced them on August 25, 1997.

At sentencing, the government contended that Sheinbaum and Birnbaum's scheme had caused a loss of $498,995. In support of this position, it produced an affidavit from Victoria Tutterrow,

4

who had worked on the 5555 Apartments, Ltd. bankruptcy as a representative for the United States Trustee's Office for the United States Bankruptcy Court for the Northern District of Texas. Tutterrow testified that the defendants deceived her into believing that the payments made to them out of the apartments' income within the year preceding bankruptcy were for legitimate pre-existing business debts. Tutterrow stated that had she known that those debts had already been repaid, she would have sought the appointment of an independent trustee, who would have sued to recover the apartment's income appropriated by the defendants.

The defendants, on the other hand, disputed the government's loss calculations. Relying on the testimony of John Flowers, a former United States Bankruptcy judge, Birnbaum and Sheinbaum argued that they were legally entitled to take the income from the apartment complex. Furthermore, Phillip Palmer, a bankruptcy attorney, concluded in an affidavit that the false statements by the defendants could not have affected Tutterrow's decision to appoint an independent trustee and thus did not contribute to any loss, an opinion shared by Flowers. Finally, the defendants contended that they should owe little or no restitution, partly because they caused no loss and partly because they had reached a civil settlement with the victim prior to sentencing.

The district court sided with the government on all these issues and fixed the loss from the defendants' scheme at $498,995. Under U.S.S.G. § 2F1.1(b)(1)(J), a loss of between $300,000 and $500,000 mandates a nine-level increase in the offense level for a

fraud. After adding these nine levels and then subtracting three levels for acceptance of responsibility, the district court arrived at a total offense level of fourteen, yielding a sentence range of fifteen to twenty-one months of incarceration. However, because the defendants provided the government with substantial assistance in prosecuting others, the district court granted the government's motion for a downward departure, settling on a sentence of seven months for each defendant. In addition, it fined Birnbaum $20,000 and ordered both defendants to pay $498,995 in restitution to their victim, Banker's Trust.

## II.

The defendants' first argument on appeal is that the district court erred in determining the amount of loss for sentencing purposes. They contend that they in fact caused no loss, as they were legally entitled to keep the income from the apartment complex for themselves and their actions in no way altered the course of the bankruptcy proceedings.

The defendants advance a complicated state-law argument, the premise of which is that the Note and the Modification Agreement entitled them to control of the income from the apartments. They entice the government into engaging them on this front. Yet whether or not the Note and the Modification Agreement created a "pledge" or an "absolute assignment" of rents is irrelevant in determining the amount of loss caused by the defendants' scheme. See generally Taylor v. Brennan, 621 S.W.2d 592, 593 (Tex. 1981) (discussing Texas law on assignment-of-rent clauses).

6

Under the Bankruptcy Code, the bankruptcy trustee could avoid any transfer from the bankrupt estate made to insiders within the year preceding the filing of the bankruptcy petition. See 11 U.S.C. § 547(b)(4)(B). At sentencing, the defendants admitted that as insiders they received $498,995 from the apartments in that one-year period. Under the Code, the only relevant defense available to Birnbaum and Sheinbaum was that these monies were received "in the ordinary course of business." See 11 U.S.C. § 547(c)(2).

The defendants' fraud operated by deceiving Tutterrow into believing that they had received the income in the ordinary course of business. Sheinbaum and Birnbaum lied to the bankruptcy court, informing it that $364,995 of the monies transferred to them were in satisfaction of a legitimate business debt. In fact, that debt had long since been repaid. As Tutterrow testified, had she known that there was no legitimate business justification for receiving that sum, she would have sought the appointment of an independent trustee, who could have sued to recover the entire $498,995 paid to insiders. Instead, she permitted the defendants to retain trustee powers as debtors-in-possession, thereby allowing them to abscond with the money. Thus, the defendants' fraud on the bankruptcy court directly led to a loss of $498,995.

The defendants attempt to argue that Texas state law entitled them to receipt of the income from the apartments, despite the Modification Agreement. This fact is simply irrelevant, however. As the defendants freely admitted in their factual resumes accompanying their guilty pleas, they knowingly withheld the

7

apartments' income from the noteholder in an attempt to force the noteholder to renegotiate the terms of the loan. By no stretch of the imagination, therefore, can the payments to the defendants be considered to have been made "in the ordinary course of business." Thus, whether or not the defendants had the right under state law to receive the income initially, under the Bankruptcy Code they could be forced to disgorge those monies unless they were entitled to the ordinary-course-of-business defense. Their fraud deceived Tutterrow into believing that they were so entitled. As Tutterrow stated in her affidavit, had she had any indication that the defendants were attempting to defraud the noteholder, she immediately would have sought the appointment of an independent trustee. Moreover, the defendants further conceded that they knew that under the Modification Agreement the income from the apartment complex could not be paid to them directly before the expenses and indebtedness on the apartments were satisfied. Defendants move too quickly when they admit as much during their plea, but then argue to us on appeal that somehow they were entitled to retain the apartments' income for themselves.

The defendants attempt to escape from the consequences of their crime by arguing that their actions caused no loss, as Tutterrow had sufficient independent authority to avoid the transfers to them, regardless of their status as ordinary-course-of-business payments. They suggest that Tutterrow could always have employed the fraudulent conveyance provisions of 11 U.S.C. § 548(b) to avoid the transfers to the defendants. Thus, they

8

contend, their false statements were of no consequence, because they did not foreclose all of Tutterrow's options. Yet Tutterrow in her affidavit never expressed a willingness to exercise her § 548(b) powers, perhaps because the defendants' deceptions led her to believe that they would be entitled to a good faith defense under 11 U.S.C. § 548(c). Regardless, as Tutterrow stated, an indication of fraud is what would have led her to seek the appointment of an independent trustee to avoid any preferential transfers. Because the defendants masked their fraud through their false statements, their crime altered Tutterrow's actions and directly caused the loss to the noteholder.

Finally, Sheinbaum and Birnbaum contend that even if they lied when they claimed they took the apartments' income to satisfy an unpaid loan, their falsehood caused no loss because 5555 Apartments, Ltd. also owed Sheinbaum $500,000 on a separate debt, which was never satisfied. Yet as the government points out, this $500,000 debt arose out of a judgment in favor of an investment banking firm, F.M. Roberts, which Sheinbaum and Birnbaum had employed to try to find investors to buy their ownership interests in 5555 Apartments, Ltd. Tutterrow believed that these syndication expenses were incurred for the personal financial benefit of the defendants, and thus did not arise "in the ordinary course of business." See 11 U.S.C. § 547(c)(2). According to Tutterrow's affidavit, had she been told that the defendants had taken income from the apartments to pay off this particular $500,000 obligation, she would have sought the appointment of an independent trustee.

9

We conclude that the district court erred neither in determining that Birnbaum and Sheinbaum caused a loss to the noteholder nor in calculating the magnitude of that loss. Accordingly, in sentencing the defendants, the court used the proper total offense level as a basis for its downward departure.

III.

The defendants also challenge the $498,995 of restitution ordered by the district court, repeating the arguments we reject above that they never caused any losses. In addition, the defendants contend that they should not owe any restitution to the victim, Banker's Trust, because prior to their convictions they entered into a civil settlement with Banker's Trust. Pursuant to the settlement, Banker's Trust agreed to release Sheinbaum and Birnbaum from all civil liability. Because Banker's Trust has already been recompensed, argue the defendants, they should not also be required to pay restitution pursuant to the Victim and Witness Protection Act, 18 U.S.C. §§ 3663-64 (Supp. 1997).

In support of their position, the defendants rely upon <u>United States v. Coleman</u>, 997 F.2d 1101 (5th Cir. 1993), <u>cert. denied</u>, 510 U.S. 1077 (1994). In <u>Coleman</u>, we held that a district court cannot order a defendant to pay restitution to a defrauded government entity when that entity had previously entered into a civil settlement and release with the defendant. The <u>Coleman</u> court, however, expressly declined to reach "the question of the effect of a full release in a civil suit not involving the government on a subsequent criminal prosecution." <u>Id.</u> at 1107 n.4. The defendants

10

urge us to extend the Coleman rule to cover all civil settlements and releases. See also United States v. Bruchey, 810 F.2d 456, 460 (4th Cir. 1987) (implying that a voluntarily executed agreement between a defendant and his victim would render a restitution order unnecessary). But see United States v. Cloud, 872 F.2d 846, 853-54 (9th Cir.) (rejecting the Bruchey holding), cert. denied, 493 U.S. 1002 (1989).

The resolution of this question turns on our characterization of the nature of restitution under the VWPA. If restitution is purely a penal device, then a civil release from liability should have no effect on a restitution order, as a court must consider public, not private, interests in fixing its sentence. If, on the other hand, restitution is inherently a compensatory measure, then civil settlements should prohibit restitution awards, as the victim would already have been compensated to its satisfaction. See Bonnie Arnett Von Roeder, Note, "The Right to a Jury Trial to Determine Restitution Under the Victim and Witness Protection Act of 1982," 63 Tex. L. Rev.671, 677-79 (1984) (describing scholarly debate over the nature of restitution).

There are strong arguments to be made that the goal of the VWPA is compensatory. See id. at 679-84 (analyzing text and legislative history of VWPA and concluding that it was intended primarily to be a compensatory, rather than punitive, statute). Indeed, the very title of the VWPA -- "The Victim and Witness Protection Act" -- might lead one to believe that the point behind the VWPA is compensation, not retribution or the like.

11

Nevertheless, the overwhelming trend in the caselaw is to read the VWPA as a penal provision. The catalyst for this trend was the Supreme Court's decision in Kelly v. Robinson, 479 U.S. 55 (1986). In Kelly, the Court was asked to consider the nature of restitution ordered under a Connecticut statute. In concluding that the Connecticut restitution statute was penal in character, the Court commented broadly about the purpose of restitution in the criminal law:

> The criminal justice system is not operated primarily for the benefit of victims, but for the benefit of society as a whole. Thus, it is concerned not only with punishing the offender, but also with rehabilitating him. Although restitution does resemble a judgment "for the benefit of" the victim, the context in which it is imposed undermines that conclusion. The victim has no control over the amount of restitution awarded or over the decision to award restitution. Moreover, the decision to impose restitution generally does not turn on the victim's injury, but on the penal goals of the State and the situation of the defendant. As the Bankruptcy Judge who decided this case noted in Pellegrino: "Unlike an obligation which arises out of a contractual, statutory or common law duty, here the obligation is rooted in the traditional responsibility of a state to protect its citizens by enforcing its criminal statutes and to rehabilitate an offender by imposing a criminal sanction intended for that purpose."

Id. at 52 (citations omitted).

Technically, the Court's comments in Kelly were aimed only at a state restitutionary system, yet in a footnote the Court hinted that they might apply to the VWPA as well. See id. at 53 n.14; see also United States v. Caddell, 830 F.2d 36, 39 (5th Cir. 1987) (concluding Kelly generally applies to both state and federal restitution orders). Nearly every circuit that has later confronted the question has taken Kelly to mean that the VWPA is penal, not compensatory, in nature. See United States v. Savoie,

12

985 F.2d 612, 619 (1st Cir. 1993); <u>United States v. Vetter</u>, 895 F.2d 456, 459 (8th Cir. 1990); <u>United States v. Hairston</u>, 888 F.2d 1349, 1355 (11th Cir. 1989); <u>Cloud</u>, 872 F.2d at 854. <u>But see Bruchey</u>, 810 F.2d at 460-61 (confusingly concluding that VWPA is fundamentally penal in nature but that nevertheless a civil settlement can absolve a defendant of the need to pay restitution). Our Circuit, without citing <u>Kelly</u>, has held that the effect of a civil settlement on a criminal restitution order "depends upon what payment was made in the settlement, whether the claims settled involved the same acts of the defendants as those that are predicated on their criminal convictions, and whether the payment *satisfies the penal purposes* the district court sought to impose." <u>United States v. Rico Indus.</u>, 854 F.2d 710, 715 (5th Cir.) (emphasis added), <u>cert. denied</u>, 489 U.S. 1078 (1989).

<u>Rico Indus.</u> and <u>Kelly</u> lead us to conclude that district courts possess the discretion to impose restitution orders in spite of civil settlements. That the victim has agreed in a civil proceeding that it has been compensated fully does not prevent a district court from pursuing the rehabilitative and retributive functions of the criminal law served by restitution. <u>Cf.</u> <u>Coleman</u>, 997 F.2d at 1107 (recognizing that "'the law will not tolerate privately negotiated end runs around the criminal justice system' in the use of the VWPA") (quoting <u>Savoie</u>, 985 F.2d at 618). <u>Coleman</u> does not command a different result. In <u>Coleman</u>, a government agency (working in close connection with the U.S. Attorney's Office) negotiated a civil settlement with the

13

defendant. We reasoned that in releasing the defendant from future civil liability, the government was essentially estopped from seeking further compensation in criminal litigation from the defendant. No such estoppel principle exists in this case, however, as the government here sought a restitutionary order in favor of a third party, Banker's Trust. Indeed, the Coleman court stressed that its holding was not meant to apply to situations like the one before us. See Coleman, 997 F.2d at 1107 & n.4. The defendants also argue that because the RTC was a named beneficiary of their civil settlement with Banker's Trust, the Coleman rule should apply. Yet as Coleman stressed, it was the fact that the government negotiated the settlement with the defendants that created an estoppel issue. Here, there is no record evidence indicating that the RTC played a substantial role in settling the civil matter.

IV.

Of course, to avoid double-counting, a district court must reduce the size of its restitution order by any amount received by the victim as part of a civil settlement. See 18 U.S.C. § 3664(j)(2) (Supp. 1997); Rico Indus., 854 F.2d at 715 ("If [the settlement] is based on the same acts, the object of restitution -- to restore the party harmed -- would indicate that [the defendant] be credited with the amount of the settlement."). Here, the victim and the defendants entered into a settlement, whereby Banker's Trust agreed to release Birnbaum and Sheinbaum from civil liability. Yet the record does not reveal what Banker's Trust

obtained in return for this release; the release itself simply states that it was given for "good and valuable consideration." We doubt that Banker's Trust struck a bargain in which it was to receive nothing of value in exchange for its release. Yet the district court ignored the potential value of the release in fashioning its restitution order. Instead, the court required the defendants to pay to Banker's Trust the full $498,995 of loss caused by their crime.

The government, however, contends that the district court's failure to credit the defendants for the value of their civil settlement does not invalidate the restitution order, as it was the defendants' burden to proffer evidence to the court as to the value of the consideration they gave to the victim in exchange for the release. We agree.

The federal restitution statute provides:

> Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government. The burden of demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents, shall be on the defendant. The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires.

18 U.S.C. § 3664(e) (Supp. 1997). It might appear to the casual observer that § 3664(e) places the burden of proof on the government on all issues relating to loss to the victim. Yet the burden section of the statute only requires the government to establish "the amount of loss sustained by [the] victim," United States v. Razo-Leora, 961 F.2d 1140, 1146 (5th Cir. 1992); it does

15

not speak to any compensation later received by the victim for that loss. Logically, the burden of proving an offset should lie with the defendant. The statute allocates the various burdens of proof among the parties who are best able to satisfy those burdens and who have the strongest incentive to litigate the particular issues involved. Having investigated the crime and wishing to provide as strong a deterrent as possible, the government is best suited to persuade the court as to the amount of loss caused by the offense. On the other hand, the defendant is better positioned to proffer evidence about his own financial resources and needs, and his desire to lower his restitution order gives him the incentive to litigate such mitigating circumstances. In a similar vein, the defendant should know the value of any compensation he has already provided to the victim in civil proceedings, so the burden should fall on him to argue for a reduction in his restitution order by that amount. Cf. United States v. Flanagan, 80 F.3d 143, 146 (5th Cir. 1996) ("[A]s a general rule, the party seeking the adjustment in the sentence is the party that has the burden of proving the facts to support the adjustment.").

Therefore, we conclude that "justice requires" that the burden of establishing any offset to a restitution order should fall on the defendant. See 18 U.S.C. § 3664(e) (Supp. 1997) ("The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires."). Although we doubt that in releasing the defendants from civil liability Banker's Trust acted in the spirit of

16

altruism, the defendants failed to present any evidence to the district court as to the value of the consideration they provided in exchange for the release. We will not simply assume that the monetary value of the consideration and the bundle of rights conferred upon the victim by the settlement equaled the monetary value of the loss sustained by the victim. If that were the case, then § 3664 would absolutely bar restitution whenever a civil settlement was reached between the defendant and the victim, rather than providing an offset for the value of the settlement. Accordingly, having failed to present valuation evidence to the district court, the defendants waived their offset claim. The district court was entitled to order both of them to pay as restitution to the victim the entire amount of loss caused by their scheme. See United States v. Chaney, 964 F.2d 437, 452-54 (5th Cir. 1992) (upholding district court's authority to impose joint and several liability for restitution).

V.

We affirm both the sentence and the restitution order imposed by the district court.

AFFIRMED.

17