**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                  No. 98-4271

THOMAS EDWARD KARAM,
Defendant-Appellant.

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Williams, Jr., District Judge.
(CR-97-194-AW)

Argued: September 24, 1999

Decided: January 6, 2000

Before MURNAGHAN and NIEMEYER, Circuit Judges, and
Frank MAGILL, Senior Circuit Judge of the United States Court of
Appeals for the Eighth Circuit, sitting by designation.

_____

Affirmed by published opinion. Senior Judge Magill wrote the opin-
ion, in which Judge Murnaghan and Judge Niemeyer joined.

_____

**COUNSEL**

**ARGUED:** Donna M. D'Alessio, EASTWICK, ROSE & WRIGHT,
P.A., Baltimore, Maryland, for Appellant. Sandra Wilkinson, Assis-
tant United States Attorney, UNITED STATES ATTORNEY'S
OFFICE, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Margaret
Lee Norton, EASTWICK, ROSE & WRIGHT, P.A., Baltimore,

Maryland, for Appellant. Lynne A. Battaglia, United States Attorney, UNITED STATES ATTORNEY'S OFFICE, Greenbelt, Maryland, for Appellee.

_____

**OPINION**

MAGILL, Senior Circuit Judge:

On May 28, 1997, Thomas E. Karam (Karam) was indicted for wire fraud in violation of 18 U.S.C. § 1343, [1] money laundering in violation of 18 U.S.C. § 1957, and aiding and abetting in violation of 18 U.S.C. § 2. On September 12, 1997, Karam pled guilty to a single count of wire fraud. The remaining counts were dismissed. The district court[2] sentenced Karam to twenty-four months imprisonment and ordered him to pay restitution in the amount of $774,508. Karam appeals the district court's restitution order. We affirm.

I.

Karam, a certified public accountant, was the managing partner of Berlin, Karam, and Ramos, P.A. (BKR), an accounting firm located in Silver Spring, Maryland. In approximately 1974, Karam and BKR began providing accounting, bookkeeping, and tax preparation services to Fairfax Anesthesiology Associates, Inc. (FAA). BKR collected all fees paid to FAA physicians by the billing unit of the hospital where they practiced and used these fees to pay physicians'

_____

[1] 18 U.S.C. § 1343 provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both.

[2] The Honorable Alexander Williams, Jr., United States District Judge for the District of Maryland.

2

bonuses, taxes, and other expenses. Because most FAA physicians' compensation was paid in the form of quarterly bonuses, FAA accumulated large amounts of cash between distribution dates. At FAA's request, Karam began investing these accumulated funds in order to obtain a profitable rate of return.

Some years after he began his relationship with FAA, Karam began providing similar accounting, bookkeeping, and tax preparation services to an entity known as Radiology Employees Pension and Profit Sharing Plan (REPP). Karam's uncle, Dr. Edward Soma (Dr. Soma), was a trustee and major participant in REPP at all relevant times.

In late 1985, Karam formed an entity known as Management Advisors, Inc. (MAI) to facilitate client investments. MAI acted as an intermediary for many FAA loans and other investments. Karam controlled MAI at all relevant times. Also in the 1980s, Karam became actively involved with Tyra Cosmetics, Inc. (Tyra). Karam owned a substantial amount of Tyra's outstanding shares and, at certain times, controlled a majority of Tyra's stock. In 1987, Karam and others formed the Bank of Northern Virginia (BNV). Karam served on BNV's board of directors until 1993.

At some time prior to 1990, without the knowledge or authorization of any FAA physician, Karam began instructing BNV employees to transfer funds from FAA's account to MAI's account. Karam took some of the funds for himself in transactions he claims were loans to him from MAI. He used other such monies to fund Tyra, which absent these cash infusions would have been forced to curtail its operations. Before 1990, Karam promptly repaid the funds he transferred from FAA with other funds properly at his disposal. In late 1990, however, primarily because of Tyra's accelerating cash flow problems, MAI was unable to locate sufficient funds to repay FAA.

In late 1990, to ensure FAA did not suffer cash flow problems due to MAI's activities, Karam transferred $500,000 from Dr. Joseph Finizio's (Dr. Finizio) BNV account to FAA's BNV account. Nine months later, Karam transferred an additional $250,000 from Dr. Finizio's BNV account to FAA. Karam completed these transfers without the knowledge or authorization of FAA or Dr. Finizio. In June 1990, Karam caused employees at BNV to transfer $500,000

3

from REPP to FAA, without the advance knowledge or authorization of any REPP trustee. Karam subsequently ordered an additional transfer of $1.2 million from REPP to FAA without authorization.

One of Karam's responsibilities as FAA's accountant and bookkeeper was to assure that FAA's quarterly payroll taxes were paid in a timely fashion to the Commonwealth of Virginia and the United States Internal Revenue Service. In June 1992, however, Karam knowingly failed to pay approximately $500,000 of FAA's payroll tax liability. Karam's activities had drained FAA of sufficient funds to meet its tax obligations. Karam also failed to pay a portion of FAA's payroll tax liabilities for the quarters ending in September and December 1992. Karam concealed his failures to meet payroll tax obligations from FAA and his partners at BKR.

In December 1992, Karam invited individual FAA physicians to "defer" their FAA bonuses and invest in Tyra. Fourteen FAA physicians decided to invest approximately $903,000 in Tyra (Tyra Loans). Each of the fourteen physicians received a promissory note from Tyra bearing a 15% interest rate. At the time these investment decisions were made, FAA physicians did not know that FAA had insufficient funds in its account to pay their bonuses because Karam had stolen FAA funds for his personal benefit. No physical transfer of money was ever actually made from FAA to Tyra. Karam repaid only $170,000 of the original $903,000 in Tyra Loans.

Sometime between late 1992 and early 1993, FAA and Karam's partners at BKR discovered Karam's misconduct. Karam resigned from BKR in May of 1993. Beginning in approximately January 1993, and continuing over the course of approximately the next two years, Karam arranged for the repayment of a substantial portion of the funds he had transferred without authorization. Civil litigation between the parties resulted in a settlement with mutual releases between Karam, REPP, FAA, and others.[3]

_____

[3] As part of the civil settlement, FAA retained a $543,000 promissory note that Karam had provided in May 1993. FAA also received a cash distribution in the amount of $275,000, plus interest. Karam paid REPP $1.2 million in cash as part of the civil settlement.

4

Karam was indicted for wire fraud and money laundering on May 28, 1997. The indictment charged a scheme to defraud between 1990 and early 1993. The alleged scheme included the transfer of $4 million from FAA and $1.7 million from REPP. The scheme also included Karam's attempts to conceal his activity by obtaining promissory notes under false pretenses and by lying to his clients. Karam pled guilty to one count of wire fraud.[4]

The district court ordered restitution in the amount of $774,508. Karam challenges the restitution order in this appeal. For reasons to be discussed, we affirm the district court's restitution order in its entirety.

II.

Karam first argues the district court erred by including losses from the Tyra Loans in its restitution award because these loans were not directly related to the conduct underlying his conviction. In general, criminal restitution orders should not be overturned in the absence of an abuse of discretion. See United States v. Henoud, 81 F.3d 484, 487 (4th Cir. 1996). We have repeatedly observed, however, that a trial court's discretion in ordering restitution is "circumscribed by the procedural and substantive protections" in the Victim and Witness Protection Act (VWPA), 18 U.S.C. §§ 3663, 3664. United States v. Bailey, 975 F.2d 1028, 1031 (4th Cir. 1992); United States v. Bruchey, 810 F.2d 456, 458 (4th Cir. 1987).

_____

[4] Count XIV, the offense of Karam's conviction, charged that:

> Thomas E. Karam . . . for the purposes of executing and attempting to execute the aforementioned scheme and artifice to defraud, did knowingly, willfully and unlawfully cause to be transmitted in interstate commerce, by means of wire communication, certain signs and signals; that is, a telephone communication from the offices of BKR in Silver Spring, Maryland to BNV in Arlington, Virginia requesting a transfer of $150,000 from a bank account of FAA maintained at BNV to the bank account of MAI maintained at BNV.

Count XIV specifically incorporated all of the factual allegations contained in the first eighteen paragraphs of Count I. These paragraphs detail Karam's scheme to defraud FAA, REPP and others.

5

Under the VWPA, a district court may order a convicted criminal to pay restitution to "any victim" of his offense. See 18 U.S.C. § 3663(a)(1). The VWPA defines a "victim" as "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663(a)(2). Federal courts may order restitution encompassing losses resulting from a criminal scheme "regardless of whether the defendant is convicted for each criminal act within the scheme," so long as the loss is a direct result of the defendant's criminal conduct or is "'closely related to the scheme.'" United States v. Henoud, 81 F.3d 484, 488 (4th Cir. 1996) (quoting United States v. Kones, 77 F.3d 66, 69 (3rd Cir. 1996)). We find that the Tyra Loans were directly related to the conduct underlying Karam's conviction, and thus, were properly included in the district court's restitution order.

The district court found that the Tyra Loans were part of Karam's "massive scheme" to defraud FAA. Moreover, by pleading guilty, Karam admitted that he "obtained promissory notes from clients and others by means of false and fraudulent representations and promises, which he used to conceal and perpetuate his criminal conduct." This admission clearly encompasses Karam's use of the Tyra Loans to deceive FAA and FAA physicians for his personal benefit.[5]

III.

Karam contends that the government failed to meet its burden of establishing the amounts of restitution due FAA and REPP.[6] Karam specifically argues that the government failed to establish that the Tyra Loans resulted in actual loss to FAA for two reasons: 1) the physicians who made the loans agreed to cancel the underlying debt for

_____

[5] Failure to identify the Tyra Loans by name is not a fatal mistake. See United States v. Bailey, 975 F.2d 1028, 1033-34 (4th Cir. 1992). Although the indictment refers to promissory notes obtained "from clients," rather than given to clients, we find that the quoted language clearly encompasses the Tyra Loans.

[6] We note that the district court ordered restitution to FAA in the amount of $389,508 and to REPP in the amount of $385,000. The total, $775,508, is the same figure as the loss stipulated in the plea agreement.

6

tax reasons; and 2) any loss suffered by individual physicians was not suffered by FAA. We reject these arguments.

Karam admits that he encouraged individual FAA physicians to "defer" their FAA bonuses and invest $903,000 in Tyra. Only $170,000 of this amount has been repaid. Karam argues, however, that the government failed to prove that FAA physicians suffered any loss because the physicians intended to cancel their loans in order to qualify for certain tax benefits. We reject this argument. The government met its burden of proving actual loss by establishing that the Tyra Loans were never fully repaid. After the government made this showing, the burden of proving any impermissible "double recovery" fell on Karam. See United States v. Parsons, 141 F.3d 386, 393 (1st Cir. 1998). Karam failed to meet this burden. Karam did not introduce any evidence that FAA physicians actually claimed Tyra Loan losses on their tax returns.

Karam next argues that FAA did not suffer any loss because of individual FAA physician investment decisions. We reject this argument. The record clearly shows that FAA did not have money to pay physicians their bonuses at the time these bonuses were supposedly "deferred" to invest in Tyra. Moreover, the supposed "deferral" allowed Karam to continue his deceit of FAA by hiding the shortfall caused by his unlawful activities. Although this money would have ultimately been paid to the investing physicians, Karam's clever accounting maneuvers depleted FAA's account of the funds it would have used to pay the physicians' bonuses.

Karam also argues that the government failed to prove actual loss to REPP of at least $385,000. We disagree. Dr. Ronald Pomerantz (Dr. Pomerantz), a REPP trustee, testified that the total loss to REPP was $500,000. Pomerantz arrived at this figure by subtracting from $1.7 million the $1.2 million paid to REPP as part of the civil settlement.[7] Karam argues that the $1.7 million in total withdrawals from REPP to FAA was based on three separate transactions, one of which was not part of Karam's criminal conduct. Specifically, Karam relies on

_____

[7] The government contends that the reason for the discrepancy between $500,000 and $385,000 is that the government made an arithmetic error when calculating fraud loss for purposes of the plea agreement.

7

language in the plea agreement that $1.2 million was withdrawn without authorization, while $500,000 was withdrawn without "advance" authorization. We find Karam's argument unpersuasive.

The entire $1.7 million was included in the indictment as part of Karam's scheme to defraud. Moreover, Dr. Soma, Karam's uncle and a REPP trustee, testified that all three transactions were made without prior knowledge or authorization. Similarly, Dr. Pomerantz, the other REPP trustee, testified that the transfer was not authorized by anyone at REPP. In light of this testimony and language in the indictment, we find that the district court properly included the entire $1.7 million in its restitution order.

IV.

Karam contends that the district court erred in failing to offset the restitution award by amounts the victims received as compensation for losses caused by Karam's criminal scheme. Specifically, Karam argues that Dr. Soma's restructuring of his own pension plan fully absorbed any loss suffered by REPP. Karam also argues that certain promissory notes fully compensated FAA and REPP for losses caused by his unlawful conduct. We reject Karam's arguments.

(A) Civil Settlement

Section 3663(e)(1) of the VWPA provides that "[t]he Court shall not impose restitution with respect to a loss for which the victim has received or is to receive compensation, except that the court may, in the interest of justice, order restitution to any person who has compensated the victim for such loss to the extent that such person paid the compensation." Although the government bears the burden of proving loss under the VWPA, the defendant bears the burden of proving that he has compensated or will compensate the victim. See United States v. Sheinbaum, 136 F.3d 443, 449 (5th Cir. 1998). The Fifth Circuit recently explained why the defendant should bear the burden of proving that the victim has been compensated in such a manner so as to preclude restitution under the VWPA:

> Logically, the burden of proving an offset should lie with the defendant. The statute allocates the various burdens of

proof among the parties who are best able to satisfy those burdens and who have the strongest incentive to litigate the particular issues involved. Having investigated the crime and wishing to provide as strong a deterrent as possible, the government is best suited to persuade the court as to the amount of loss caused by the offense. On the other hand, the defendant is better positioned to proffer evidence about his own financial resources and needs, and his desire to lower his restitution order gives him the incentive to litigate such mitigating circumstances. In a similar vein, the defendant should know the value of any compensation he has already provided to the victim in civil proceedings, so the burden should fall on him to argue for a reduction in his restitution order by that amount.

Id. We agree.

Karam argues that personal guarantees executed in the form of promissory notes constituted full and complete compensation for his victims.[8] Karam failed to raise this argument at sentencing. Thus, Karam's argument is subject to review for plain error. Four conditions must be met in order for there to be plain error under Rule 52(b):

---

[8] Karam caused the notes representing REPP's "loans" to FAA and certain other notes to be replaced by ten civilly enforceable promissory notes (Replacement Notes) made payable to REPP. The Replacement Notes were for a total of $2,595,000, collectively, and replaced the $500,000 and the $1.2 million notes from FAA, and notes from Drs. Kennedy and Sirh in the amounts of $260,000 and $390,000.

In 1993, three of the ten Replacement Notes were satisfied in full, representing a payment of $345,000. Karam contends that the district court should have credited much of this amount against the losses caused by his unlawful transfer of REPP funds to FAA, rather than solely to the Kennedy and Sirh debt. We disagree. Dr. Pomerantz, a REPP trustee, testified that there was no principled way to apply the $345,000 to any of the notes because money is fungible. In other words, regardless of where REPP credits the $345,000 payment, the bottom-line remains unaffected. Given the lack of any crediting principle, we conclude that the district court did not commit plain error in failing to credit the $345,000 payment towards the debts of FAA.

9

there must be (1) an error, such as a deviation from a legal rule; (2) the error must be plain, meaning obvious, or at a minimum, clear under current law, (3) the error must affect substantial rights--in other words, the error must be so prejudicial as to affect the outcome of the proceedings in the district court; and(4) the reviewing court must determine if the error "`seriously affects the fairness, integrity or public reputation of judicial proceedings.'" United States v. Hanno, 21 F.3d 42, 45 (4th Cir. 1994) (quoting United States v. Olano, 507 U.S. 725, 736 (1993)). Appellants bear the burden of proof with respect to the prejudice of their rights. See Olano, 507 U.S. at 734.

We have suggested in dicta[9] that a promissory note voluntarily executed as part of a settlement agreement would constitute full and immediate restitution. See United States v. Bruchey, 810 F.2d 456, 460 (4th Cir. 1987). The Bruchey court went on to note that once a district court found such an agreement, it "would have no further role to play under the VWPA. The victim would simply enforce the civil obligation through the ordinary civil process." Id. We decline to adopt the Bruchey dicta and instead hold that a voluntarily executed promissory note does not necessarily constitute full and complete restitution under the VWPA.

A civil settlement does not preclude an award of restitution under the VWPA because restitution under the VWPA is primarily penal in nature. See United States v. Cloud, 872 F.2d 846, 854 (9th Cir.), cert. denied, 493 U.S. 1002 (1989); United States v. Sheinbaum, 136 F.3d 443, 447-48 (5th Cir. 1998). Restitution pursuant to the VWPA is designed to serve the rehabilitative and retributive purposes of the criminal law, rather than merely compensate victims with an amount to which they feel entitled.[10] See Sheinbaum, 136 F.3d at 447-48. The

_____

[9] The facts in Bruchey, briefly stated, were that the district court had compelled the defendant to sign a long-term promissory note payable to the victim as a form of restitution. Because the court failed to make specific findings of fact, and because the term of the restitution order exceeded time limits established by the VWPA, this court vacated and remanded. See id. at 458-60. The existence of a promissory note or other settlement agreement was, therefore, not material to the court's judgment.

[10] In Kelly v. Robinson, the Supreme Court commented broadly about the purpose of restitution in the criminal law:

10

fact that Karam's victims may have accepted certain promissory notes as full compensation does not necessarily determine whether these victims are entitled to restitution pursuant to the VWPA.**11** Rather, the critical question is whether the victims have been <u>actually</u> compensated for losses caused by a defendant's criminal conduct. In this case, Karam failed to meet his burden of proving that certain promissory notes fully compensated his victims for injuries caused by his misconduct.

_____

> The criminal justice system is not operated primarily for the benefit of victims, but for the benefit of society as a whole. Thus, it is concerned not only with punishing the offender, but also with rehabilitating him. Although restitution does resemble a judgment "for the benefit of" the victim, the context in which it is imposed undermines that conclusion. The victim has no control over the amount of restitution awarded or over the decision to award restitution. Moreover, the decision to award restitution generally does not turn on the victim's injury, but on the penal goals of the State and the situation of the defendant.

479 U.S. 36, 52 (1986). Although these comments were aimed only at a state restitution system, the Court hinted in a footnote that they might apply to the VWPA as well. <u>See id.</u> at 53 n.14. Indeed, nearly every circuit to have addressed the question has taken <u>Kelly</u> to mean that the VWPA is penal, not compensatory, in nature. <u>See Bruchey</u>, 810 F.2d at 460 n.*; <u>United States v. Sheinbaum</u>, 136 F.3d 443, 447-48 (5th Cir. 1998), <u>cert. denied</u>, 493 U.S. 1002 (1989); <u>United States v. Savoie</u>, 985 F.2d 612, 619 (1st Cir. 1993); <u>United States v. Vetter</u>, 895 F.2d 456, 459 (8th Cir. 1990); <u>United States v. Hairston</u>, 888 F.2d 1349, 1355 (11th Cir. 1989); <u>United States v. Cloud</u>, 872 F.2d 846, 854 (9th Cir. 1989).

**11** We do not by our holding mean to imply that REPP or FAA may obtain a double recovery for injuries resulting from Karam's criminal scheme. The VWPA itself expressly forecloses this possibility. In this case, the district court was fully apprised of, and clearly considered, the existence and terms of the settlement agreement between the parties. Karam simply failed to meet his burden of proving that the victims were fully compensated as a result of the settlement or any voluntarily executed promissory notes.

11

(B) <u>Dr. Soma's Pension Account</u>

At the time of sentencing, Karam argued that, in addition to the $1.7 million that was transferred from REPP to FAA, he used REPP money to "loan" money to Tyra. Two of these three transactions, which totaled $650,000 (REPP Loans), were not authorized and were never repaid. After the discovery of Karam's scheme, REPP participants thought that Dr. Soma should bear any loss caused by his nephew's unauthorized transfer of funds while he was serving as REPP trustee. At the time of REPP's liquidation, Dr. Soma accepted the REPP Loans as part of his personal portfolio, thereby fully absorbing any loss caused by his nephew's misconduct.

Karam now argues that the district court erred in failing to offset any compensation due REPP because Dr. Soma's restructuring of his personal portfolio fully compensated REPP for losses caused by the REPP Loans. We reject this argument. Although REPP may have focused the entire loss on one of its members, the fact remains that REPP was never made whole for the loss caused by the REPP Loans. In short, despite Dr. Soma's assumption of the REPP Loans, the loss remained entirely within the ranks of the REPP membership.

V.

Karam claims that the district court erred in not making specific factual findings regarding his ability to pay before ordering him to pay full restitution for all losses caused by the offense of his conviction. We have consistently held that the 1992 VWPA requires the district court to make specific factual findings with respect to a defendant's financial resources, financial needs, and earning abilities. <u>See United States v. Castner</u>, 50 F.3d 1267, 1277 (4th Cir. 1995); <u>United States v. Plumley</u>, 993 F.2d 1140, 1142-43 (4th Cir. 1993) (per curiam); <u>United States v. Bailey</u>, 975 F.2d 1028, 1031 (4th Cir. 1992). Under the 1992 VWPA, these findings must be keyed to the amount of restitution ordered. <u>See Castner</u>, 50 F.3d at 1277. We have held that a sentencing court satisfies its duty to make specific findings if it adopts a presentence report "that contains adequate factual findings to allow effective appellate review of the fine or restitution." <u>Id.</u> at 1277 (4th Cir. 1995); <u>United States v. Molen</u>, 9 F.3d 1084, 1086-87 (4th Cir. 1993), <u>cert. denied</u>, 511 U.S. 1071 (1994).

12

The Mandatory Victims Restitution Act of 1996 (MVRA) substantially amended the 1992 VWPA by requiring district courts to impose "full" restitution without considering the defendant's economic circumstances. See 18 U.S.C. § 3664(f)(1)(A). Under the 1992 VWPA the procedure is reversed: the court must first consider the defendant's financial circumstances before setting the amount of restitution to be paid. See 18 U.S.C. § 3664(a) (1995). Because Karam's criminal activity occurred before the MVRA's effective date, [12] Karam claims that its retrospective application would violate the Ex Post Facto Clause of the United States Constitution.[13]

In this case, the record does not disclose which statute the district court relied on when making its restitution order. Assuming, without deciding, that the district court was required to apply the 1992 VWPA, Karam failed to object to the district court's failure to make the required factual findings at the time of sentencing. When a defendant fails to object at sentencing to the calculation of restitution, the defendant waives appellate review except for plain error. See Castner, 50 F.3d at 1277. In this case, we find that Karam failed to show that the district court's alleged failure to make specific factual findings prejudiced his rights in any way.

In this case, the district court found that Karam was in a position to pay "some restitution." Although the district court did not make

_____

[12] The MVRA states that it "shall, to the extent constitutionally permissible, be effective for sentencing proceedings in cases in which the defendant is convicted on or after [April 24, 1996]." 18 U.S.C. § 2248 (statutory notes).

[13] Several circuits have ruled that applying the MVRA to criminal conduct committed before the MVRA's enactment violates the Ex Post Facto Clause because restitution imposed as part of a defendant's sentence is a criminal punishment, and not a civil sanction. See United States v. Edwards, 162 F.3d 87 (3d Cir. 1998); United States v. Siegel, 153 F.3d 1256, 1259-61 (11th Cir. 1998); United States v. Williams, 128 F.3d 1239, 1241 (8th Cir. 1997); United States v. Baggett, 125 F.3d 1319, 1322 (9th Cir. 1997); United States v. Thompson, 113 F.3d 13, 15 n.1 (2d Cir. 1997). But see United States v. Newman, 144 F.3d 531, 538-40 (7th Cir. 1998) (holding that restitution is not criminal punishment for purposes of the Ex Post Facto Clause).

13

independent findings regarding Karam's ability to pay restitution, it did adopt the factual findings of the Presentence Investigation Report (PSR). The PSR reveals that Karam is a well-educated man with extensive experience in managerial and entrepreneurial endeavors. Despite Karam's negative net worth at the time of sentencing, the district court could have concluded that this setback was only temporary. A negative net worth at the time of sentencing does not necessarily indicate an inability to pay, especially when the PSR establishes that a defendant has knowledge and skills in the areas of financial planning, business administration and corporate strategies. See, e.g., Bailey, 975 F.2d at 1032.

In sum, Karam has not demonstrated a sufficient probability that the amount of restitution would have been different had the court made specific factual findings regarding his ability to pay. He has not, therefore, shown that the error was a defect affecting substantial rights, which is the third prerequisite for obtaining relief under Rule 52(b). In short, because Karam's PSR contains sufficient facts to support the imposition of restitution, we conclude that under the plain error standard, the district court did not err in calculating his restitution.

VI.

Karam next contends that his sentence is illegal because the district court denied him his right to allocution in violation of Federal Rule of Criminal Procedure 32(c)(3). We disagree. Karam never objected to his alleged denial of allocution at the time of trial. Thus, any error is subject to review only for plain error. In this case, the district court made findings exactly in accordance with the stipulated facts and guideline factors contained in the plea agreement. Karam was sentenced to the low end of the guidelines. It is hard to discern how Karam's rights were prejudiced in any way.

VII.

Karam also argues that the district court erred in ordering him to pay an "indefinite amount of restitution." We reject this argument. The judgment and commitment order specifically orders Karam to "pay restitution in the amount of $774,508.00. During supervised

14

release, restitution payment of $1,200 per month for 36 months." This order anticipates full payment of $774,508.00 after the conclusion of Karam's supervised release.

VIII.

For the foregoing reasons, we affirm the district court's order of restitution in its entirety.

<u>AFFIRMED</u>

15