■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JIMMY TZITZIKALAKIS, Appellant. [807 NYS2d 360]—

Judgment, Supreme Court, New York County (Budd G. Goodman, J., at plea and sentence; Carol Berkman, J., at restitution hearing), rendered July 24, 2003, convicting defendant, upon

his plea of guilty, of grand larceny in the second degree and falsifying business records in the first degree, and sentencing him to a term of 1 to 3 years on the larceny conviction and a conditional discharge on the falsifying business records conviction, with an order to pay restitution in the amount of $340,143, unanimously modified, on the law, to the extent of vacating the restitution order and remanding the matter for a new restitution hearing in accordance herewith, and otherwise affirmed.

Defendant is the owner of Foundation Construction Consultants, a construction firm that performed various construction projects on behalf of the City of New York pursuant to a contract with the City's Department of Citywide Administrative Services (DCAS). In connection with its performance under the contract, Foundation hired numerous subcontractors to provide labor and materials. In order to receive payment under the contract, Foundation was required to submit periodic payment requisitions to DCAS, incorporating itemized cost worksheets and invoices from subcontractors in order to document its expenditures. The payment requests were then reviewed by a resident engineer employed by DCAS, who determined whether the work had been completed in compliance with the contractual specifications and whether the invoiced materials had been provided to the various sites.

Pursuant to the contract, Foundation was paid $2.7 million from 1996 through 1998. Subsequently, an investigation revealed that defendant had submitted numerous false invoices purportedly from subcontractors in an amount totaling $686,343. Defendant pleaded guilty to grand larceny in the second degree and falsifying business records in the first degree, and was sentenced as indicated above. The court ordered a hearing to determine the amount of restitution to be paid.

At the restitution hearing, Christine Carl, a confidential investigator for the New York City Department of Investigation testified for the People. After detailing the payment process required by the contract, Carl identified several invoices that had been falsified by defendant. For instance, one invoice was allegedly from a subcontractor, Custom Woodworking, for which defendant was paid $130,530, plus a 1% material markup. Carl was informed by the owners of this company that the submitted invoice was not one of their own, and that their invoices documented work costing only $29,650 during the relevant time period.

Two other invoices from subcontractors Essex Glass ($44,161, plus 1% material markup) and Vack Electric ($279,650, plus 1% material markup) were paid to defendant, but Carl's investiga-

tion revealed that neither company was in existence at the time the work was done. Defendant was also paid $148,450, plus material markup, on an invoice from Coastal Design Gallery, but the manager of Coastal estimated that his company had performed work valued at $30,000 to $40,000 during the course of the contract. Ms. Carl was able to confirm that the items on this invoice were actually provided to the work site.

Defendant also received payment of $177,400 on multiple invoices submitted for Dynamic Sheet Metal, although a company representative indicated to Carl that they did, at most, $50,000 worth of work. Subsequently, however, the same representative submitted a letter changing that amount to between $130,000 to $160,000, after being contacted by defendant. Another invoice requested payment of $156,750 for work done by City Scaffolding, but that company's president submitted an affidavit stating that only $140,143 was performed. Although defendant was not paid on this invoice, $76,689.95 was paid directly to City Scaffolding for work performed under the contract.

After discussing the invoices, Carl testified as to her method of calculating the amount of overpayments. She began with the face amount of the false invoice, and then deducted the amount that the legitimate contractors indicated was the cost of the work actually performed. Where a price range was identified by a subcontractor, defendant was given the benefit of the higher cost, with the exception of Dynamic, where the initial $50,000 estimate was credited. Defendant was given no credit for the invoices relating to the nonexistent companies, despite the fact that the work and materials listed on those invoices were apparently provided. Carl also deducted the amount of the City Scaffolding invoice for which defendant was never paid, but added the amount the City paid directly to this subcontractor. Finally, Carl deducted the "retainage amount," an amount that is withheld on all city contracts in the ordinary course of business, arriving at a total overpayment amount of $340,143.

During the restitution hearing, defense counsel attempted to cross-examine Carl about whether the work and materials reflected on the invoices had been actually provided. The court precluded this line of inquiry, stating: "So, now, I've been listening to this cross-examination and to our discussion together for some time, and the bottom line is the reason that there isn't real evidence as to what was provided is your client's crime. What he is charged with is the false instrument for filing, and that's the problem here. So if you would stop asking this witness whether she has any evidence that [work] wasn't done, perhaps we can move on."

Later, defense counsel attempted to introduce evidence of the fair market value of the labor and materials provided on the invoices, which the court also precluded. The court explained: "The entire thrust of your cross-examination is that your client provided something for the City and that the City is, therefore, not out that much . . . [b]ut here's my problem: The City would not have paid a single red cent . . . no matter what he did, if he built the Taj Mahal in the middle of City Hall Park unless he put in proper requests for payment supported by invoices and supported by these work time records . . . [s]o the issue of what the City is out, right, is all the money they paid him because of these false documents. That's what the City is out. Even though they gained something."

Ultimately, the court clarified its ruling, stating that although it would not permit evidence of fair market value in the form of "blue book" price lists and the like, it would permit evidence of actual documented expenditures by Foundation in performing the work or obtaining the materials identified in the false invoices. The court reasoned: "[I]f you would please just give me some proof as to what he actually did and what he paid for it and what his costs were, I will be happy, and apparently the prosecutor would be happy, to set it off . . . [y]ou are asking me here to put the burden on the prosecution, which I will not do. I don't think it's their burden. How could it be?"

After the hearing, the court issued a written decision fixing the amount of restitution at $340,143. Although it agreed with defendant's argument that it is the People's burden to prove the City's out-of-pocket losses, it disagreed with defendant as to how those losses are determined. The court held: "Having received moneys by falsifying documents, the defendant cannot now claim that DCAS has the burden of proving the degree to which [what] defendant has provided fell short of his falsified claims. To the contrary, what defendant provided constitutes an offset to the amounts illegitimately obtained by the falsified records. The defendant has the burden of establishing the actual services performed/materials provided, and that these materials and services were legitimately obtained by him . . . [T]he defense has been given an opportunity to establish actual offsets, as opposed to estimates, speculation and wishful thinking. No such proof has been offered."

On appeal, defendant argues the hearing court violated Penal Law § 60.27 and CPL 400.30 by relieving the People of their burden of proving the City's actual out-of-pocket loss at the restitution hearing. In addition, he contends that the court erred in precluding him from introducing evidence of the fair

market value of the goods and services provided to the City under the contract. We agree, in part, with each of defendant's contentions and remand for a new restitution hearing.

Penal Law § 60.27 (1) authorizes a sentencing court to order restitution of "the fruits of his or her offense or reparation for the actual out-of-pocket loss caused thereby." According to this definition, "restitution may be no greater than the sum necessary to compensate the victim for out-of-pocket losses (L 1992, ch 618; *see, People v Fuller*, 57 NY2d 152, 158, n 6)" (*People v Consalvo*, 89 NY2d 140, 144 [1996]). Before ordering restitution, the court must make a finding as to the dollar amount of the fruits of the offense and the out-of-pocket loss (Penal Law § 60.27 [2]). If the record does not contain sufficient evidence to make such a finding, or if the defendant requests, the court must conduct a hearing to determine the restitution amount pursuant to CPL 400.30 (*id.*). "When factual issues concerning a victim's restitution are disputed, the People bear the burden of proving, by a fair preponderance of the evidence, the facts in support of the restitution request to the satisfaction of the sentencing court" (*People v Horne*, 97 NY2d 404, 410-411 [2002]). Moreover, at the restitution hearing, "[a]ny relevant evidence is admissible unless privileged regardless of its admissibility under the rules of evidence" (*Consalvo* at 145; CPL 440.30 [4]).

While the parties and the hearing court agree that the statute places the burden on the People to prove the victim's out-of-pocket loss, there is disagreement as to whether a defendant or the People have the burden of proving the amount of setoffs, or credits, to which defendant is entitled. Defendant notes that CPL 400.30 (4) places the burden of proof exclusively on the prosecution, and includes no exemption for setoffs. He further asserts that because the City admits that its resident engineer certified that the work and materials on the falsified invoices were in fact provided, the City had, in effect, conceded that it had received all of the materials and services required by the contract with defendant. Thus, he argues, the only way for the People to meet their burden of proving the City's actual out-of-pocket loss is to prove the actual cost of the benefits received by the City, and then deduct that sum from the face amount of the false invoices.

The People and the hearing court took a different view, concluding that the City's out-of-pocket loss should be determined by the face amount of the false invoice, less any setoffs, but that it is defendant's burden of proving the actual value of the work and materials provided to the City. The People noted

that many federal courts have required criminal defendants to bear the burden of proving setoffs to a restitution order, since they are usually in the best position to determine the value of the setoffs and have the most incentive to litigate the issue.

We are constrained to find that defendant's interpretation of CPL 400.30 (4) is the correct one. First, the language of CPL 400.30 (4) clearly and unambiguously places the burden of proof on the People to demonstrate the amount of the out-of-pocket loss to the victim. In a simple larceny case, this would not be a difficult task since the victim may testify as to the value of the stolen property. Here, it is more difficult because although defendant stole discrete sums of money from the City, he did so by submitting false and inflated invoices for work actually completed in the performance of a construction contract. Since the City clearly received something of value despite the false documentation, the key to determining the City's out-of-pocket loss is to find out how much, if any, the City overpaid on each falsified invoice. As defendant argues, the only way to do this is to determine the cost of the work and materials he provided, and to subtract that cost from the amount of the false invoice. Based upon the clear wording of the statute, the burden of proving this cost rests squarely on the People.

To satisfy their burden, the People could have introduced evidence of the actual cost of labor and services reflected on these invoices. They elected not to do so. In the past, testimony by industry experts has been utilized by the prosecution at restitution hearings in order to establish the amount of a victim's out-of-pocket loss (*see People v Consalvo*, 303 AD2d 202, 202-203 [2003], *lv denied* 100 NY2d 593 [2003] [no reason why expert statistical evidence should not be used at a restitution hearing]). Although the City's investigator did make some affirmative efforts to determine the value of the existing subcontractors' services by interviewing their owners or principals, in the case of the nonexistent contractors, she made no effort at all to determine their value. Accordingly, even though the City indisputably received materials and services of a significant value in the case of the nonexistent subcontractors, the hearing court incorrectly found that the City was "out-of-pocket" the entire amount of the false invoice. While the court obviously agreed with the People that it is unfair to impose the burden on them to determine the value of the undocumented services provided by a criminal wrongdoer, that is a burden placed upon them by the restitution statute and we are powerless to alter it.

The federal cases relied upon by the People are distinguishable since those holdings rest on the language of the federal

restitution statute (18 USC § 3664), which is significantly different from our statute. The federal statute allocates the burden of proof among the parties, depending on the circumstances: "The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government. The burden of demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents, shall be on the defendant. *The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires*" (18 USC § 3664 [e] [emphasis added]).

Based on this statutory grant, many federal courts have held that the burden of proving setoffs to a restitution order should logically fall on the defendant, who generally is in the best position to determine their value and has the most incentive to litigate the issue in order to reduce the restitution amount (*see e.g. United States v Sheinbaum*, 136 F3d 443, 449 [5th Cir 1998], *cert denied* 526 US 1133 [1999]; *United States v Karam*, 201 F3d 320, 327 [4th Cir 2000]; *United States v Sims*, 2003 WL 22016771, *4, 2003 US Dist LEXIS 9835, *13 [ED Pa June 4, 2003]). Here, in contrast, CPL 400.30 (4) places the burden of proof singularly on the People and affords a restitution court no discretion to modify this procedure.

We are compelled to note, however, our agreement with the hearing court that it is unfair to place the burden on the People to prove the value of undocumented services provided by a criminal wrongdoer, in order to ascertain the proper restitution amount. Accordingly, we recommend that the Legislature examine whether CPL 400.30 should be amended in a manner consistent with the federal restitution statute, as several other states have already done with respect to their restitution statutes (*see e.g.* Fla Stat § 775.089 [7]; Wis Stat § 973.20 [14] [a]-[c]).

We also agree, in part, with defendant's arguments that the hearing court was unduly restrictive in precluding evidence that the work required by the contract had been completed and of the fair market value of materials or services listed on the relevant invoices. In our view, the hearing court failed to abide by the liberal evidentiary standard for restitution hearings, which provides that "[a]ny relevant evidence, not legally privileged, may be received regardless of its admissibility under the exclusionary rules of evidence" (CPL 400.30 [4]).

Contrary to the hearing court's view, evidence that the work required under the contract was actually completed is relevant to prove that the City received something of significant value

from defendant's company, which should then be deducted from the amount of the false invoice. Regardless of who bears the burden of proof on setoffs, the evidence is certainly relevant and admissible under this liberal statutory standard and should not have been precluded.

The fair market value of the services or materials actually provided may, in appropriate circumstances, also be relevant to proving the victim's actual out-of-pocket loss. While the introduction of legitimate invoices from subcontractors certainly is one way of proving a defendant's actual costs, it is not the only way. If the materials used and services provided can be identified with reasonable certainty, the defendant should be permitted to introduce their fair market value as evidence of their actual cost. Of course, where the materials or services cannot be identified nor their condition established, the restitution court maintains the discretion to exclude such evidence as speculative. Our holding is limited to a finding that, contrary to the hearing court's suggestion, fair market value of the materials or services provided is not per se irrelevant to the court's out-of-pocket loss finding. Concur—Friedman, J.P., Marlow, Gonzalez and Catterson, JJ.