UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

Nos. 00-4337(L)
(CR-98-152)

United States of America,

                                        Plaintiff - Appellee,

        versus

Gary D. Bollin, et al.,

                                        Defendants - Appellants.

O R D E R

        The court further amends its opinion filed June 7, 2001, and amended September 6, 2001, as follows:

        On page 21, first full paragraph, line 11 -- the court information for United States v. Fulbright is corrected to read "(5th Cir. 1986)."

                                        For the Court - By Direction

                                        /s/ Patricia S. Connor
                                        Clerk

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

Nos. 00-4337(L)
(CR-98-152)

---

United States of America,

Plaintiff - Appellee,

versus

Gary D. Bollin, et al.,

Defendants - Appellants.

---

O R D E R

---

The court grants the unopposed motion for publication and amends its opinion filed June 7, 2001, as follows:

On the cover sheet, section 1 -- "UNPUBLISHED" is changed to read "PUBLISHED."

On page 2, section 2 -- the status line is corrected to begin "Affirmed by published opinion. . . ."

On page 3 -- the reference to use of unpublished opinions as precedent is deleted.

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                                    No. 00-4337

GARY D. BOLLIN,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                                    No. 00-4347

ERNST N. TIETJEN,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                                    No. 00-4406

JAMES GORMLEY,
Defendant-Appellant.

Appeals from the United States District Court
for the Southern District of West Virginia, at Huntington.
Robert C. Chambers, District Judge.
(CR-98-152)

Argued: March 2, 2001

Decided: June 7, 2001

Before WILKINSON, Chief Judge, MOTZ, Circuit Judge, and
Cynthia Holcomb HALL, Senior Circuit Judge of the
United States Court of Appeals for the Ninth Circuit,
sitting by designation.

_____

Affirmed by published opinion. Senior Judge Hall wrote the opin-
ion, in which Chief Judge Wilkinson and Judge Motz joined.

_____

## COUNSEL

**ARGUED:** Jane Moran, JANE MORAN LAW OFFICES, William-
son, West Virginia, for Appellant Bollin; George A. Mills, III, Hun-
tington, West Virginia, for Appellant Tietjen; Mark Jeffery Kadish,
THE LAW OFFICE OF MARK J. KADISH, Atlanta, Georgia, for
Appellant Gormley. Philip Henry Wright, Assistant United States
Attorney, Charleston, West Virginia, for Appellee. **ON BRIEF:**
Rebecca A. Betts, United States Attorney, Charleston, West Virginia,
for Appellee.

_____


_____

## OPINION

HALL, Senior Circuit Judge:

Appellants raise numerous challenges to their convictions and sen-
tences stemming from their involvement in an investment fraud
scheme and the subsequent coverup. We conclude that their chal-
lenges lack merit and therefore affirm the judgments below. We also
conclude that pursuant to the Supremacy Clause, federal forfeiture
law supersedes the garnishment protections that Georgia state law
provides for funds in an individual retirement account.

2

I. FACTUAL AND PROCEDURAL BACKGROUND

This case arose out of a wide-ranging investment fraud scheme, carried out by a network of conspirators, who bilked millions of dollars from investors across the country. The investments were programs that promised enormous profits, supposedly derived from secret trading in debentures issued by European "prime" banks. The conspirators included Stephen Oles, a self-described "trader" in the fraudulent investment programs; appellant Ernst Tietjen, another trader; Ramona Holcombe and Stanie Benz, who served as "project managers" or "directors" for the programs; appellant Gary Bollin, a "broker" for the fraudulent investments; Roger Damron, who offered the investments in and near Huntington, West Virginia; David Raimer and his wife, Jennifer, who conducted numerous bank transactions involving investors' funds; and appellant James Gormley, an attorney from Atlanta, Georgia, who advised and assisted Oles, David Raimer, Bollin, and Damron with the fraudulent investments and money laundering. The cast of characters relevant to Appellants also included Finbar F. Dempsey & Company, a law firm in the Turks and Caicos Islands; Robert Edwards, an escrow agent and attorney in Atlanta; Dr. Ralph and Rita Touma, investors; and other investors in the programs.[1]

In mid-1995, David Raimer and Oles began offering investment programs under the name "Exodus International." The programs involved supposed trading of European "prime bank" debentures and promised very high rates of return with little or no risk to investors. According to the Exodus literature that they distributed, the programs were available on a limited basis to groups of investors whose money would be pooled and delivered to a "prime" bank. The investment principal was supposedly secured by a bank guarantee and, therefore, was never at risk. Millions of dollars in profits were to be generated within a few months from the trading of debentures. For example, one program, "Program 39," offered a profit of $73,000,000 in ten months, based on an investment of $400,000.

_____

[1] Because only the appeals of Bollin, Tietjen, and Gormley are before us, we limit our discussion of the facts to those facts relevant to Appellants.

To carry out the scheme, bank accounts were established with the guidance and assistance of Oles's attorney, appellant Gormley. Raimer established an escrow account in Orlando, Florida, under the name "Exodus International." Per Gormley's advice, the account was to be non-interest bearing so as to avoid attracting the IRS's attention. The account was to be used ostensibly to deliver investors' funds into a debenture trading program. Gormley also helped establish an off-shore account in the Turks and Caicos Islands in the name of "BCI Corporation," which was part of a so-called "three-tiered" offshore trust. According to Gormley, the offshore trust would shield income from taxation and was the "vehicle" through which the debenture trading program was to be conducted.

Appellant Bollin learned about Exodus International Program 39 in May 1995. At Oles' suggestion, Bollin discussed the program with Gormley. Gormley explained to Bollin how the program worked and drew a sketch for him showing how funds would move through the program. Gormley told Bollin that debenture trading programs work "if they're handled right" and that "once they start paying, they pay forever." After Bollin gave Gormley literature about Program 39, Gormley told him that the program looked "pretty good."

Gormley also recommended the Exodus International Program to Stanie Benz. Gormley told Benz that he had extensive experience reviewing debenture trading programs and that he had reviewed the Exodus Program and found it to be a good investment. Gormley explained the relationship between debenture trading programs and offshore trust accounts, and described how such an account could be used as a holding point for pooling investors' funds and for transfer-ring funds without their being traceable.

Bollin introduced the Exodus Program 39 to Roger Damron. At Bollin's recommendation, on July 20, 1995, Damron met with Gorm-ley. Gormley advised Damron concerning the Program 39 literature and debenture trading programs in general, and advised him on for-eign grantor trusts to facilitate the investments and avoid tax liability. Gormley had Finbar F. Dempsey & Company set up foreign grantor trusts in the Turks and Caicos Islands for Damron and Bollin. Gorm-ley also established international business corporations for Damron and Bollin and advised them about their use in conducting business

4

for the trusts. In addition, Gormley prepared several documents for Bollin and Damron, such as profit sharing agreements. The idea was that Damron would bring investors into the programs, Bollin would act as the broker, and Ramona Holcombe would serve as the program manager and link to the trader, Stephen Oles, who would conduct the actual trading.

Damron approached a couple with whom he had a previous investment relationship, Dr. Ralph and Rita Touma, and sought money to place in Exodus Program 39.[2] The Toumas decided to invest, and, in late July 1995, gave Damron $750,000. Damron put $400,000 in an escrow account held by Robert Edwards, another Atlanta attorney, awaiting an opening in Program 39. Unbeknownst to the Toumas, Damron paid Bollin $75,000 from this money.

On September 13, 1995, Holcombe faxed to Gormley the wire coordinates to transfer funds into Program 39. Gormley forwarded the fax to Bollin, who then faxed it to Damron.[3] Then, on September 19, 1995, Gormley drafted a letter for Damron's signature, directing the transfer of the $400,000 from Edwards' escrow account to Bollin's foreign grantor trust in the Turks and Caicos Islands, an account set up by Gormley. Damron signed the letter and sent it to Edwards. Edwards wired the money as instructed on September 20, 1995.[4] A few days later, the money was again transferred, this time from Bollin's trust account to Damron's trust account, also set up by Gormley in the Turks and Caicos Islands. From Damron's account, the money was sent to the BCI Corporation account in the Turks and Caicos Islands, an account controlled by Oles and Raimer.

After the Toumas' money was sent off, Damron began collecting money from other people for investment in another, similar trading program, the "second deal." Bollin told Damron that the second deal would again involve Oles as the trader, but would involve Benz as the

_____

[2] According to Damron, Dr. and Mrs. Touma were his "best customers" in the Gold Eagle Program, a program run by Damron that involved investments in gold coins.

[3] This fax is the basis for the wire fraud charge in Count Three.

[4] The transfer of the $400,000 is the basis for the money laundering charge in Count Six.

5

"project director." Oles later "lateraled" his role as the trader to appellant Tietjen. Although the second deal was similar to Exodus Program 39, instead of the money going to Oles' BCI Corporation account in the Turks and Caicos Islands, the money was transferred to an account in England.

Oles had introduced Tietjen to Benz. Tietjen was the head of a church known as the Apostolic Order of the Remnant House of Israel (AORHI). According to Tietjen, AORHI existed wherever he lived, supposedly for the purpose of funding humanitarian projects. To fulfill its purpose, AORHI created other entities, which Tietjen called limited trusts, to hold assets, and an entity called General Securities, Ltd. (GSL), to "assist in the money-making." Under cover of these entities, Tietjen created official-looking financial documents, such as a "Zero Coupon Prime Capital Note," and offered debenture trading programs with very high rates of return. In all, Tietjen received, or expected to receive, $2.4 million of investors' funds for placement in his debenture trading program.

After Damron sent the money for the second deal, he collected another $140,000 from investors in November and December 1995 for placement in yet another debenture trading program, the "third deal." In January 1996, Damron wired $130,000 of the investors' money to his account in the Turks and Caicos Islands. The money was to be sent off for investment.

As it turned out, the debenture trading programs were complete frauds. The Government's expert explained that investment programs involving the trading of debentures or other financial instruments issued by so-called "prime banks" do not exist. Indicators of the fraudulent nature of such programs include the use of the term "prime bank;" convoluted and nonsensical descriptions of the investment program itself; very unrealistic rates of return with little or no risk; an assertion that investors' funds represented "good, clean cleared funds of non-criminal origin;" and the claim that entities such as the Federal Reserve Bank or the World Bank had approved the programs or accepted the documents. These characteristics of fraud were present in the Exodus Program 39 documents.

Instead of placing the money into bank debentures, Oles transferred the money from the BCI Corporation account to the Exodus Interna-

6

tional account in Orlando. David Raimer withdrew funds from the account and sent cash to Oles upon request. Oles used these funds for himself, and Raimer also kept large sums. The funds sent to Tietjen similarly were not placed in a debentures trading program, but instead worked their way through various accounts in the names of AORHI and others, with much of the money being used by Tietjen for his own purposes.

When the Toumas, Damron's investors in Program 39, did not receive payments as promised, they began to call Damron regularly to find out when their payouts would materialize. Oles reportedly assured Bollin that payments were imminent. In turn, Bollin reassured Damron, who, in turn, reassured the Toumas. After more time passed without a payout, the Toumas eventually spoke with Bollin and Gormley. Bollin assured them that the payout would come and that he, like them, was waiting for money. He also told them that he had previously traded in these programs and that while it was normal for payment to be delayed, the programs always paid. Bollin said that he would get paid only if the investment paid out, failing to disclose that Damron had already paid him $75,000 out of the Toumas' money. Gormley told the Toumas that he did not know much about their investment, but that he knew these programs did pay out in the past, and that the delays "usually work themselves out in a week or so." Gormley told the Toumas that they had the option to sue Oles for their money, but warned that a lawsuit would only lead to more delays in receiving their money.

Bollin also spoke with another investor, Marianne Bradley, who had invested as part of the second deal. When Bradley asked about the status of her investment, Bollin stated that "trades are being made," that trading had started on January 16, and that "we" had "frozen the account to protect the money." Bollin also stated that he had invested $100,000 in the same program as Bradley and that he would occasionally get involved in a trading program with $100,000 to $500,000. He stated that based on his experience, the program would either pay out as promised in ten days or Bradley would get her money back. Bollin, however, did not invest any of his own money in the second deal, and his only investment experience had been a $100 investment several years before.

7

Finally, in January 1996, the Toumas reported their dealings with Damron to the FBI. On February 9, 1996, the FBI conducted a search of Damron's house. Shortly thereafter, a grand jury investigation was commenced in Huntington, West Virginia.

Damron decided to return to the investors the $130,000 sent to his account in the Turks and Caicos Islands for the third deal. Damron wired over $120,000 of the money to Gormley and $8,000 to himself so that Gormley could arrange for checks to the investors. Gormley also arranged for backdated paperwork to be created by the attorneys in the Turks and Caicos Islands to explain the earlier transfer of $130,000 as a "loan" from one of Damron's companies to another. The loan paperwork was created in March 1996, but was backdated to January 17, 1996, the date of the $130,000 transfer.

Damron was eventually indicted for his involvement in the investment fraud scheme. After the indictment, Oles decided to send Damron $50,000. Damron was then under a financial reporting requirement with the court. He contacted Gormley, who advised him how to structure the transaction so as to avoid the court-imposed reporting requirement. On Gormley's advice, the transfer was structured as a loan from Bollin's wife to Damron's wife. Bollin kept $10,000 for himself and sent the remaining $40,000 to Damron in increments of $5,000. Gormley also assisted in Damron's receipt of an additional $100,000 from Oles, again funneled through the Turks and Caicos Islands.

In August 1997, Gormley informed Damron that Oles was again sending money to Damron, $400,000, to be used to pay back certain investors. Gormley and Damron discussed how to use the money for "damage control." They decided to repay Damron's numerous investors in the second deal but not the Toumas. Damron prepared a list of investors who had invested in the program and how much they had invested. He gave the list to Gormley. Later, Damron sent a separate letter to Paul Dempsey in the Turks and Caicos Islands, detailing the investors who were to receive payments and directing that the payments be made. A copy of that letter with Damron's handwritten notation that it had been faxed to Dempsey was found in Gormley's office. The investors listed in Damron's letter were all paid, receiving checks from the Turks and Caicos Islands in plain envelopes with no

8

return address and no cover letter. Approximately $400,000 was repaid to twenty investors. Gormley was paid $20,000 by Oles for his services.

When the Government learned of the payments to the investors, who were potential witnesses against Damron, it sought to have the money placed in escrow pending resolution of Damron's case. At a hearing in October 1997, Gormley testified that to his knowledge, Damron had not directed, coordinated, or orchestrated the payments to investors.

Damron eventually pleaded guilty to mail fraud and money laundering and agreed to cooperate with the United States in its investigation of the other conspirators. On September 9, 1998, Appellants Gary Bollin, Ernst Tietjen, and James Gormley were charged in a fourteen-count indictment, along with co-defendants Stephen Oles, Ramona Holcombe, Stanie Benz, David Raimer, and Jennifer Raimer, for criminal acts stemming from the fraudulent investment scheme.

Count One charged all defendants with conspiring to commit wire fraud, securities fraud, and obstruction of justice, in violation of 18 U.S.C. § 371. Count Two charged all defendants with violating 18 U.S.C. § 1956(h), conspiracy to launder money. The indictment also included a forfeiture provision as to all defendants, premised upon a conviction for money laundering, and included a notice to seek substitute assets. Tietjen was not named in any of the other counts.

Both Gormley and Bollin faced additional charges. Both were charged in Count Three with aiding and abetting wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. Count Six charged them with aiding and abetting money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2. Bollin was also charged in Count Four with an additional count of wire fraud, and in Counts Seven and Eight with two more counts of money laundering. In Counts Nine and Ten, Bollin was charged with selling securities without having registered with the Securities and Exchange Commission, in violation of 15 U.S.C. §§ 78o(a)(1) and 78ff. Gormley was charged in Counts Thirteen and Fourteen with perjury, in violation of 18 U.S.C. § 1623. The district court dismissed Count Fourteen at trial.

9

Before trial, defendants David Raimer and Stanie Benz pleaded guilty to charges in the indictment. The charges against Jennifer Raimer were dismissed. Stephen Oles fled and remained a fugitive throughout the trial. On November 19, 1999, a jury returned a guilty verdict against the remaining defendants on each count submitted to the jury. The jury also returned a $1.2 million forfeiture verdict. The district court denied the post-trial motions for judgment of acquittal and/or a new trial made by Gormley, Bollin, and Tietjen.

The district court sentenced Bollin to 108 months imprisonment, three years supervised release, and restitution in the amount of $783,535.[5] The court sentenced Tietjen to 135 months imprisonment, two years supervised release, and $1,761,035 in restitution.[6] The court sentenced Gormley to 97 months imprisonment, three years supervised release, and $783,545 in restitution.[7] Each defendant was also found jointly and severally liable for the $1.2 million forfeiture.[8] Following the entry of judgment against each defendant, each defendant filed a timely notice of appeal.

## II. SUFFICIENCY OF THE EVIDENCE

Appellant Gormley challenges the sufficiency of the evidence supporting his convictions on Counts One, Two, Three, Six, and Thirteen. In reviewing the sufficiency of the evidence, a reviewing court must take the evidence in the light most favorable to the government and must determine whether any rational juror could have found the

_____

[5] Bollin was sentenced to 108 months imprisonment on Counts Two, Six, Seven, Eight, Nine and Ten, and 60 months on Counts One, Three and Four, to run concurrently.

[6] Tietjen was sentenced to 60 months imprisonment on Count One and 135 months on Count Two, to run concurrently.

[7] Gormley was sentenced to 60 months imprisonment on Counts One, Three, and Thirteen, and 97 months on Counts Two and Six, to run concurrently.

[8] In an interlocutory appeal, Gormley challenged the district court's ruling that he could be held jointly and severally liable for any forfeitable assets possessed by his codefendants. This court affirmed in an unpublished opinion. United States v. Gormley, 176 F.3d 476, 1999 WL 212008 (4th Cir. 1999) (per curiam) (unpublished).

10

elements of the offense beyond a reasonable doubt. <u>United States v. Burgos</u>, 94 F.3d 849, 862 (4th Cir. 1996).

A. <u>Sufficiency of the Evidence on Count One--</u>
       <u>Conspiracy to Commit Wire Fraud, Securities Fraud,</u>
       <u>and Obstruction of Justice</u>

To support a conviction for conspiracy, "the government must show, first, that a conspiracy existed; then that the defendant had knowledge of the conspiracy; and finally, that the defendant voluntarily became a part of the conspiracy." <u>United States v. Bell</u>, 954 F.2d 232, 236 (4th Cir. 1992), <u>overruled on other grounds by Burgos</u>, 94 F.3d at 862. Gormley contends that the Government proved three distinct conspiracies instead of the single conspiracy alleged in Count One of the indictment: one conspiracy to commit wire fraud, a second conspiracy to commit securities fraud, and a third conspiracy to obstruct justice. Gormley argues that the Government's proof resulted in a material variance.

A "variance" occurs when "the evidence at trial establishes facts materially different from those alleged in the indictment." <u>United States v. Kennedy</u>, 32 F.3d 876, 883 (4th Cir. 1994). A defendant may establish that a material variance occurred "by showing that the indictment alleged a single conspiracy but that the government's proof at trial established the existence of multiple, separate conspiracies." <u>Id.</u>; <u>see also Kotteakos v. United States</u>, 328 U.S. 750, 755-56 (1946). The question whether the evidence shows a single or multiple conspiracies is for the jury, and the finding of a single conspiracy must stand unless the evidence, taken in the light most favorable to the Government, would not allow any reasonable juror to reach such a verdict. <u>United States v. Urbanik</u>, 801 F.2d 692, 695 (4th Cir. 1986).

We are satisfied that the jury's finding of a single conspiracy was supported by substantial evidence. Although the conspiracy had multiple objects--wire fraud, securities fraud, and obstruction--the objects clearly were related to the overall goal of defrauding investors through fraudulent offshore debentures trading programs. <u>See United States v. Squillacote</u>, 221 F.3d 542, 574 (4th Cir. 2000) (explaining that a close relation between the objects of alleged separate conspiracies supports a finding of a single conspiracy), <u>cert. denied</u>, 121 S.Ct.

11

1601 (2001); <u>United States v. Walsh</u>, 544 F.2d 156, 161 (4th Cir. 1976) (noting that a single conspiracy may have multiple objects). The co-conspirators obtained funds from investors through securities fraud. The wire fraud was used to move the investors' funds into the hands of Oles, the Raimers, and Tietjen. The obstruction was part of controlling the damage after Damron came under investigation for his role in the fraudulent debentures trading program.

The fact that some of the co-conspirators, including Gormley, never marketed the debentures trading programs to the actual investors does not prevent a finding of a single conspiracy because a defendant may be a member of a conspiracy without taking part in all of its activities. <u>See United States v. Banks</u>, 10 F.3d 1044, 1054 (4th Cir. 1993). Similarly, a single conspiracy may be found even though Tietjen, Holcombe, and Benz were not active in returning money to investors. The very structure of the scheme in this case required the conspirators to play different roles--brokers, project managers, and traders--to carry out the fraud and obscure the disposition of funds placed in the trading programs. Gormley prepared the different instruments used to carry out the scheme to defraud investors and directed the opening of the offshore trusts. Further, because a shifting membership in the conspiracy does not preclude a finding of a single conspiracy, a single conspiracy may be found even though Benz and Tietjen were involved only in later deals. <u>United States v. Lozano</u>, 839 F.2d 1020, 1023 (4th Cir. 1988). Finally, regardless of whether "hostility" arose between Oles on one side and Damron, Gormley and Bollin on the other after Damron was indicted in 1997, Oles was the source of the funds sent to Damron and the source of the funds used to repay investors, thus supporting the conclusion that they were participating in a common scheme. In sum, the evidence was sufficient to support the jury's finding of a single conspiracy.[9]

_____

[9] The evidence also was sufficient to support the jury's conclusion that Gormley was part of the conspiracy. Gormley was involved with Oles, the Raimers, Bollin, and Damron from the very beginning. Gormley knew how the Exodus Program worked, as we discuss in more detail below, knew the program was fraudulent, and took actions in furtherance of the scheme. After Damron was placed under investigation, Gormley also played a role in the return of funds to investors.

12

Moreover, even if the evidence established separate conspiracies, a variance is grounds for reversal only if it infringed the defendant's "`substantial rights' and thereby resulted in actual prejudice." <u>Kennedy</u>, 32 F.3d at 883. "In order to show actual prejudice stemming from a multiple conspiracy variance, an appellant must prove that `there are so many defendants and so many separate conspiracies before the jury' that the jury was likely to transfer evidence from one conspiracy to a defendant involved in an unrelated conspiracy." <u>Id.</u> (quoting <u>United States v. Caporale</u>, 806 F.2d 1487, 1500 (11th Cir. 1989)).

In <u>Kennedy</u>, we held that an alleged variance had no prejudicial effect because there was "no possibility that evidence from unrelated conspiracies would be improperly attributed to individual defendants." <u>Kennedy</u>, 32 F.3d at 883. <u>Kennedy</u> involved eight defendants and, at most, three related conspiracies. We recognized that "cases involving similar numbers of defendants and conspiracies are `not so complex by definition that the jury will be unable to segregate the evidence properly.'" <u>Id.</u> (quoting <u>Caporale</u>, 806 F.2d at 1501 (eleven defendants and two conspiracies)). Further, the fact that the district court ordered a severance, and each defendant thus faced trial alone, virtually eliminated any likelihood of prejudicial "spillover" of evidence. <u>Id.</u>

Like in <u>Kennedy</u>, this case involves only eight named defendants and, if there was a variance, at most three conspiracies. Although the district court did not order a severance, only four of the eight defendants named in the indictment were tried together. Further, the district court granted Gormley's request for a multiple objects jury instruction, instructing the jury to consider each defendant's role in the conspiracy. The verdict form required the jury to make particularized findings about which objects each defendant conspired to violate, further helping the jury to compartmentalize the evidence as to each defendant. Any risk of a "spillover effect" was slight. Gormley's conviction on Count One is affirmed.

B. <u>Sufficiency of the Evidence on Count Three, Wire Fraud</u>

To convict Gormley for wire fraud in violation of 18 U.S.C. § 1343, "the government must prove: `1) a scheme to defraud and 2)

13

the use of a wire communication in furtherance of that scheme.'" United States v. ReBrook, 58 F.3d 961, 966 (4th Cir. 1995) (quoting United States v. Brandon, 50 F.3d 464, 467 (7th Cir. 1995)); see also 18 U.S.C. § 1343. Gormley argues that the evidence is insufficient to prove that he transmitted or caused to be transmitted to Damron a September 13, 1995, memorandum, which furnished the wire coordinates for investors to send funds to Oles' offshore Exodus account. Gormley also argues that the Government failed to prove that Gormley knew the funds to be sent to Oles' offshore account came from the Toumas, and thus the Government failed to prove that Gormley had the requisite fraudulent intent. We conclude that the evidence was sufficient to support the jury's verdict.

Holcombe testified that she faxed the memorandum containing the wire coordinates to Gormley's office on September 13, 1995, and the fax headers on the document confirm her testimony. Damron testified that he received the memorandum from Bollin on September 13, 1995. Bollin testified that he could not recall how he obtained the document. Holcombe, however, testified that she faxed the memorandum only to Gormley because she believed that he was the person controlling the funds. Although Gormley shared office space with seven to nine other attorneys, he was a sole practitioner, and the attorneys in Gormley's space-sharing arrangement did not share clients. There is no evidence that Bollin worked with any of the other attorneys in Gormley's office. The evidence supports the conclusion that Gormley received the memorandum from Holcombe and furnished it to Bollin, who in turn sent the memorandum to Damron.

Further, assuming that Gormley did not know the $400,000 came from the Toumas,[10] Gormley's lack of knowledge is irrelevant because, as the Government points out, it was not required to prove that anyone had put up any money and had actually been defrauded in the wire fraud scheme (i.e., that the scheme succeeded), so long as the act of wire fraud was in furtherance of the scheme. See United States v. Bryan, 58 F.3d 933, 943 (4th Cir. 1995), abrogated on other grounds by United States v. O'Hagan, 521 U.S. 642, 650 (1997). Gor-

_____

[10] As we discuss below, there was sufficient evidence from which the jury could infer that Gormley was aware that the Toumas had contributed to the $400,000.

14

mley's delivery of the wire coordinates for Oles' offshore account was in furtherance of the fraudulent investment scheme. Moreover, there is sufficient evidence from which the jury could infer that, by the time of the September 13, 1995, fax, Gormley knew the scheme was fraudulent. Gormley was a self proclaimed securities lawyer, and he claimed to be an expert on investment programs. Gormley reviewed the Exodus Program documents and was aware that the Program was a prime bank debentures trading program. The Government's expert testified that there were numerous indicators of fraud in the Exodus Program documents that should have raised a red flag to an experienced securities lawyer. If Gormley was not already aware that the debentures trading program was a scam, on August 17, 1995, Gormley met with Agent David Caruso of the Federal Bureau of Investigations, who explained the fraudulent nature of investment programs involving "prime bank" financial instruments, like the Exodus Program. We conclude that Gormley's wire fraud conviction was supported by the evidence.

C. Sufficiency of the Evidence on Count Six, Money Laundering, and Count Two, Money Laundering Conspiracy

A money laundering conviction under 18 U.S.C. § 1956 requires:

> (1) that the defendant conduct a financial transaction with at least a de minimis effect on interstate commerce; (2) that the transaction involved the proceeds of a specified unlawful activity; (3) that the defendant knew that those proceeds were derived from that specific unlawful activity; and (4) that the defendant engaged in the transaction intending to promote that unlawful activity.

United States v. France, 164 F.3d 203, 208 (4th Cir. 1998), cert. denied, 527 U.S. 1010 (1999); 18 U.S.C. § 1956(a)(1)(A)(i). Funds are the proceeds of unlawful activity if they "are derived from an already completed offense, or a completed phase of an ongoing offense." United States v. Conley (Conley I), 37 F.3d 970, 980 (3d Cir. 1994); see also United States v. Butler, 211 F.3d 826, 829 (4th Cir. 2000), cert. denied, 121 S. Ct. 1091 (2001). "This is true even if the money laundering transaction can also be considered a part of the continuing specified unlawful activity." United States v. Morelli, 169

15

F.3d 798, 804 (3d Cir.), <u>cert. denied</u>, 528 U.S. 820 (1999). A defendant must have subjective knowledge that the funds were the proceeds of unlawful activity. <u>United States v. Campbell</u>, 977 F.2d 854, 857 (4th Cir. 1992).

Gormley's money laundering conviction is based on the September 20, 1995, transfer of $400,000 from Edwards' escrow account to Bollin's trust account in the Turks and Caicos Islands. Gormley drafted a letter dated September 19, 1995, from Damron to Edwards directing Edwards to release the $400,000.[11] Gormley disputes only whether the Government proved that he knew the funds were the proceeds of fraud. Gormley argues that the evidence failed to establish that Gormley knew the Toumas had put up the $400,000, but instead established that Gormley had been informed by Damron that the money came from Damron's profits from trading in Gold Eagle coins. There was substantial evidence, however, from which the jury could reasonably infer that Gormley knew the $400,000 was the proceeds of fraud.

In July 1995, Damron discussed with Gormley the Exodus Program documents, foreign bank debenture trading programs, and foreign grantor trusts. Damron testified that he wanted a foreign grantor trust because the money he planned to place in the Exodus Program would be his clients' money: "If I participated in the program, it would be with money from my clients. So I felt that I should have control over it, I should have my own foreign grantor trust." Damron's client with regard to the $400,000 was Dr. Touma. To protect Dr. Touma's interest, Damron asked Gormley about designating beneficiaries of his foreign grantor trust:

> Q: When did you have your discussion with Mr. Gormley about foreign grantor -- beneficiaries of foreign grantor trusts?

_____

[11] Gormley suggests that the evidence showed that Damron drafted the release letter, not Gormley. We disagree. Damron testified on direct examination that Gormley drafted the release letter, which Damron then signed and sent to Edwards. Damron did not repudiate his testimony that Gormley drafted the letter, but merely confirmed on cross examination that he instructed Edwards in a letter that the $400,000 was to be transferred.

16

A: That was -- would be just probably late July. It was before Dr. Touma -- or maybe shortly thereafter-- when Dr. Touma was getting ready to make that large investment, he was concerned that if I was okay, it was okay, but what if something happened to me. He wanted some protection for his money. And so I asked Mr. Gormley what could we do.

Q: What did Mr. Gormley tell you?

A: Well, that's what we did. We set up that successor beneficiary thing so that if something happened to me, it was all spelled out who would get what percentage of the money.

This testimony supports an inference that Gormley knew Dr. Touma had contributed to the $400,000.

Further, Gormley confirmed in a letter dated July 24, 1995, that Dr. Touma was set up as the beneficiary of the trust. In the same letter, Gormley mentioned that "as to the investment matter we discussed," the funds would be held in Gormley's escrow account pending receipt of documents and a bank guarantee. Damron testified that the "investment matter" was the placement of $400,000 into the Exodus Program. Gormley was aware that Damron had deposited the $400,000 with an escrow agent, Edwards, in preparation for the investment. At this point, Gormley refused to give Damron the "green light" because no bank guarantee had yet been provided.

A short time later, in August 1995, Gormley met with Agent Caruso of the FBI, who explained to Gormley the fraudulent nature of prime bank debenture trading programs. By this point, if not earlier, Gormley knew these debenture trading programs were fraudulent. Nonetheless, on September 13, 1995, in furtherance of a program he knew was a scam, Gormley sent to Bollin the fax from Oles and Holcombe containing the wire coordinates to Oles' offshore Exodus account, thereby participating in wire fraud.

Gormley then prepared and faxed a profit sharing agreement between Damron and Bollin, dated September 18, 1995. The agree-

17

ment noted that "Damron has introduced Bollin [sic] certain individuals who have placed U.S. $400,000 in Escrow for investment." This agreement contemplated Damron and Bollin splitting profits of over $1.8 million per week. Gormley then prepared for Damron the September 19, 1995, letter instructing Edwards to transfer the $400,000 to Bollin's foreign grantor trust. The funds were transferred the next day.

There is sufficient evidence to establish that Gormley knew the Exodus Program was a fraud, knew the $400,000 was being invested in this fraud, and knew he was facilitating the transfer of the funds to the perpetrators of this fraud. Furthermore, based on his knowledge that Dr. Touma was the beneficiary of Damron's foreign grantor trust, the reference to "certain investors" in the Bollin/Damron profit sharing agreement, and Gormley's connections with and knowledge of the relationships among Oles, Bollin, Damron, their offshore accounts, and the Exodus Program, the jury could reasonably infer that, at the time Gormley participated in the transfer of the $400,000 to Bollin's offshore account, Gormley knew the money was the proceeds of fraud.[12] We are satisfied that there was sufficient evidence to support Gormley's money laundering conviction.

Gormley raises the same arguments as to the sufficiency of the evidence on Count Two, the money laundering conspiracy charge. For the same reasons, we conclude that there was sufficient evidence to support the jury's verdict.

D. Sufficiency of the Evidence on Count Thirteen, False Declarations before the Court

Gormley was convicted of making false declarations before the court under 18 U.S.C. § 1623(a), based on two allegedly false statements that he made at an October 23, 1997, contempt hearing. In 1997, after Damron was placed under investigation, a financial

_____

[12] Thus, it is irrelevant whether Gormley, as an attorney, had a duty to inquire as to the source of his client's funds because he knew the $400,000 was the proceeds of fraud. Indeed, Gormley knew the $400,000 was the proceeds of a fraudulent scheme when he participated in wire fraud in furtherance of that scheme on September 13, 1995.

18

restraining order was issued against Damron. While that restraining order was in effect, approximately $400,000 was repaid to certain investors. When questioned about the $400,000 in repayments, Gormley testified as follows:

> Q: And what is your understanding as to those disbursements and how they occurred?
>
> A: And I believe that those are the bank drafts that these individuals received. And from everything I know, that money was not Mr. Damron's money, he didn't own it, he didn't control it.
>
> And I don't know what this word "expectancy interest" is in the Court's order, exactly what that means, but I don't believe that Mr. Damron had any such interest in that money.
>
> Q: Did Roger A. Damron direct or coordinate or orchestrate the disbursement of these funds to these individual investors?
>
> A: To my knowledge he did not.

The indictment alleged that at the time of his testimony, Gormley knew Damron had an interest in the $400,000 and knew Damron had coordinated, orchestrated and directed the repayments. Gormley contends that his perjury conviction should be reversed because (1) there was insufficient evidence to show that Gormley knew of Damron's role in the repayment; (2) the examiner's questions before the grand jury were fundamentally ambiguous and were insufficient as a matter of law to support a perjury conviction; and (3) his responses were literally true.

The evidence was sufficient to show that, at the time of his testimony, Gormley knew of Damron's role in returning the money to the investors. Before any money was sent to the investors, Damron and Gormley discussed who should be paid. Damron prepared a list of the amounts due to the investors and sent the list to Gormley. The persons

19

on that list were the persons who were eventually paid. Further, dis-covered in Gormley's office was a copy of a handwritten fax from Damron to Paul Dempsey in the Turks and Caicos Islands, directing the repayment of money to the investors. The fax was dated August 27, 1997, and a notation indicated that it was faxed "before 10:30 am." Damron testified that it was his practice to make a notation in the upper right corner of a document when he faxed it. Moreover, based on the presence of the notation on faxes that Gormley received from Damron, the jury could reasonably infer that Gormley was fully aware of Damron's practice. Although Damron testified that Gormley refused to forward to Dempsey the list of investors to be repaid and advised Damron not to do it himself, there is sufficient evidence to support the conclusion that, at the time of his October 23, 1997, testi-mony, Gormley knew Damron had directed Dempsey to send the money to the investors.

Gormley argues that the examiner's question whether Damron "di-rected, coordinated, or orchestrated" the disbursement of funds to the investors was fundamentally unclear and impossible to answer, and therefore an improper basis for a perjury charge. Gormley argues that the question asked of him is like the question found insufficient to support a perjury conviction in United States v. Rendon-Marquez, 79 F. Supp. 2d 1361 (N.D. Ga. 1999), aff'd mem., 228 F.3d 416 (11th Cir. 2000). In Rendon-Marquez, the defendant was asked on an INS form, "Have you knowingly committed any crime or offense, for which you have not been arrested; or have you been arrested, cited, charged, indicted, convicted, fined, or imprisoned for breaking or vio-lating any law or ordinance, including traffic violations?" The form provided for only a "yes" or a "no" response. The defendant answered in the negative, but had once been arrested. The district court granted a judgment of acquittal because it found the question to be a confus-ing compound question that asked two separate and distinct questions, but provided for only a yes/no response. Id. at 1363. The result was that the defendant would give a partially false answer no matter how he responded, making the defendant's response to the question an improper basis for a perjury conviction. Id.

"[P]recise questioning is imperative as a predicate for the offense of perjury." Bronston v. United States, 409 U.S. 352, 362 (1973). Unlike in Rendon-Marquez, Gormley was asked a single question, to

20

which he gave a fully false response. The question asked of Gormley presented three possibilities, all of which--direct, coordinate, and orchestrate--are similar in meaning. All three refer to some conduct on Damron's part intended to bring about the repayment of investors. The evidence showed that Damron engaged in such conduct and that Gormley knew Damron engaged in such conduct. We find the question to be perfectly intelligible.[13] The question asked of Gormley was not ambiguous or unanswerable, and the matter was properly submitted to the jury. See United States v. Heater, 63 F.3d 311 (4th Cir. 1995) (affirming a perjury conviction based on the defendant's false response to the question whether he had ever "bought or sold marijuana" because the question did not contain any fundamental ambiguity that would have prevented the jury from considering the question).

Gormley next argues that his response to the second question was literally true because it was Oles, not Damron, who provided the funds to be used for repayment. "A literally true answer, even though unresponsive or `shrewdly calculated to evade,' cannot form the predicate for a perjury conviction." United States v. Sainz, 772 F.2d 559, 563 (9th Cir. 1985) (quoting United States v. Cowley, 720 F.2d 1037, 1042 (9th Cir. 1983)). However, "`an answer that is responsive and false on its face does not come within [a] literal truth analysis simply because the defendant can postulate unstated premises of the question that would make his answer literally true.'" United States v. Fulbright, 804 F.2d 847, 851 (5th Cir. 1986) (quoting United States v. Cuesta, 597 F.2d 903, 920 (5th Cir. 1979)). Even though Oles provided the $400,000, there was sufficient evidence to establish that Damron was the one who instructed Dempsey to repay certain investors and how much to pay them. Gormley knew of Damron's role in the repayment but testified to the contrary.[14] Gormley's perjury conviction is affirmed.

_____

[13] Moreover, the question appears to have been perfectly intelligible to Gormley. As his response to the first question indicates, when Gormley did not understand a question or a term, he communicated his lack of understanding.

[14] We need not reach Gormley's argument that his response to the first question was literally true because his false response to the second question was sufficient to support his conviction. The jury was entitled to find

21

III. TRIAL ERRORS

Bollin and Tietjen challenge several of the district court's evidentiary rulings. Decisions regarding the admissibility of evidence are committed to the sound discretion of the trial court and will not be reversed absent an abuse of discretion. United States v. Bostian, 59 F.3d 474, 480 (4th Cir. 1995). Where a defendant fails to object to an asserted error at trial, the "plain error" standard applies. United States v. Olano, 507 U.S. 725, 731-32 (1993); Fed. R. Crim. P. 52(b).

A. Attorney-Client Privilege

Bollin contends that Robert Edwards' testimony was admitted in violation of Bollin's attorney-client privilege. The district court's decision whether certain evidence is subject to the privilege is a mixed question of law and fact subject to de novo review. In re Grand Jury Proceedings, 33 F.3d 342, 353 (4th Cir. 1994). The party claiming the privilege bears the burden of demonstrating that: "the attorney-client privilege applies; (2) the communications were protected by the privilege; and (3) the privilege was not waived." United States v. Aramony, 88 F.3d 1369, 1389 (4th Cir. 1996). Assuming that an attorney-client relationship existed between Bollin and Edwards,[15] Bollin does not identify any particular testimony that allegedly was privileged, but instead argues that Edwards should not have been allowed to testify at all. It is well-established, however, that the

_____

Gormley guilty for either response because the United States charged in the conjunctive, charging that Gormley falsely testified about whether Damron had an interest in the $400,000 and whether he had, in fact, coordinated, orchestrated, and directed the repayment of investors. See Turner v. United States, 396 U.S. 398, 420 (1970) (reaffirming the "general rule" that where an indictment charges several acts in the conjunctive, a guilty verdict stands if the evidence is sufficient with respect to any one of them); United States v. Sarihifard, 155 F.3d 301, 310 (4th Cir. 1998) (applying the Turner rule to a perjury charge).

[15] The record shows that Bollin contacted Edwards to act as an escrow agent and not for the purpose of seeking legal advice. The district court assumed, without finding, that an attorney-client relationship existed between Bollin and Edwards.

22

attorney-client privilege protects only confidential communications made for the purpose of seeking legal advice. E.g., <u>United States v. Tedder</u>, 801 F.2d 1437, 1441-42 (4th Cir. 1986). The privilege does not prevent an attorney from testifying as to non-confidential matters.

Moreover, we agree with the district court that Bollin waived any privilege that may have attached when he testified to the grand jury regarding the same transactions and communications about which Edwards testified. <u>See United States v. Plache</u>, 913 F.2d 1375, 1380 (9th Cir. 1990) (finding a waiver of the attorney-client privilege where the defendant testified before the grand jury regarding his conversations with counsel). The fact that Bollin was testifying before the grand jury pursuant to a subpoena does not preclude effective waiver. <u>See id.</u> The district court did not err in allowing Edwards to testify.

B. <u>Exclusion of Evidence of Oles' Flight</u>

Bollin further contends that the district court abused its discretion by excluding evidence that co-defendant Stephen Oles absconded. Bollin argues that the evidence of Oles' flight would have shown Oles to be a man who manipulated Bollin into participating in the events in this case, and would have been highly probative of Bollin's intent. Although a co-defendant's flight may be relevant to show the guilt of that defendant, <u>see United States v. Porter</u>, 821 F.2d 968 (4th Cir. 1987), it does not tend to show that another defendant is innocent, at least not where, as here, there can be more than one guilty party. <u>See United States v. Ortland</u>, 109 F.3d 539, 545 (9th Cir. 1997). Further, any probative value of Oles' flight was substantially outweighed by the danger of confusing the issues where Oles was not being tried with the rest of the defendants. <u>See</u> Fed. R. Evid. 403. The district court did not abuse its discretion.

C. <u>Admission of Bollin's Grand Jury Testimony</u>

Bollin contends that the district court abused its discretion when it allowed the Government to present a redacted version of his grand jury testimony but refused to allow him to present the omitted portions under the rule of completeness or the former testimony exception to the hearsay rule. We find no abuse of discretion.

23

## 1. Former Testimony Exception

Federal Rule of Evidence 804(b)(1) provides an exception to the hearsay rule for the former testimony of a declarant where the declarant is unavailable as a witness.[16] A declarant is "unavailable" when the declarant "is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement." Fed. R. Evid. 804(a)(1). Bollin contends that he was "unavailable" because he had invoked his Fifth Amendment privilege against self-incrimination.

A criminal defendant who invokes his Fifth Amendment privilege makes himself unavailable to any other party. United States v. Bumpass, 60 F.3d 1099, 1102 (4th Cir. 1995). Rule 804(a) provides, however, that "[a] declarant is not unavailable as a witness if exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or testifying." Fed. R. Evid. 804(a). By invoking his Fifth Amendment privilege, Bollin made himself unavailable for the purpose of preventing his testimony, and he therefore cannot invoke the exception in Rule 804(b)(1). Accord United States v. Peterson, 100 F.3d 7, 13 (2d Cir. 1996) (holding that a defendant who exercises his privilege not to testify at a second trial of his case is not entitled to introduce the testimony he gave at the first trial); United States v. Kimball, 15 F.3d 54, 55-56 (5th Cir. 1994) (same).

## 2. Rule of Completeness

The "rule of completeness" is found in Federal Rule of Evidence 106, which provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the

_____

[16] Bollin also argues that his grand jury statements are not hearsay. His statements to the grand jury were made out of court, and Bollin would introduce them to prove the truth of the matter asserted. They are hearsay. See Fed. R. Evid. 801(c). The statements were admissible by the Government as admissions under Rule 801(d)(2).

24

> introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Fed. R. Evid. 106. The purpose of the rule is "to prevent a party from misleading the jury by allowing into the record relevant portions of the excluded testimony which clarify or explain the part already received." United States v. Wilkerson, 84 F.3d 692, 696 (4th Cir. 1996). The portions of the excluded testimony thus must be relevant to an issue in the case, and the court need only admit the portions that are necessary to clarify or explain the portion of the testimony already admitted. Id.

Bollin identifies several portions of his grand jury testimony that he contends should have been admitted under Rule 106. We have reviewed Bollin's grand jury testimony as admitted and his unredacted grand jury testimony. Like the district court, we conclude that the omitted testimony was not necessary to avoid misleading the jury or otherwise place the admitted testimony in context. The fact that some of the omitted testimony arguably was exculpatory does not, without more, make it admissible under the rule of completeness.

D. Admission of Tietjen's Grand Jury Testimony

The Government introduced against Tietjen a redacted version of his grand jury testimony. Because Tietjen did not raise at trial his objections to the admission of his grand jury testimony, the plain error standard of review applies. See Olano, 507 U.S. at 731-32.

Tietjen first argues that his grand jury testimony was taken in violation of his Fifth Amendment right against self-incrimination, and therefore should not have been admitted. His claim is foreclosed by United States v. Washington, 431 U.S. 181, 188 (1977). Like in Washington, after being sworn, Tietjen was explicitly advised that he had the right not to incriminate himself and that if any questions tended to incriminate him, he had the right under the Fifth Amendment not to answer the question. He was advised that anything he said could be used against him by the grand jury or in subsequent legal proceedings, and was advised of his right to counsel. The Government correctly and completely answered Tietjen's later questions regarding

25

his Fifth Amendment privilege. These warnings eliminated any possible compulsion to self-incrimination. See id. at 188. Whether Tietjen was a target of the grand jury investigation is irrelevant under Washington. See id. at 189; United States v. Goodwin, 57 F.3d 815, 818-19 (9th Cir. 1995).

Tietjen also maintains that his Sixth Amendment right to counsel had attached at the time of his grand jury testimony. But at the time Tietjen testified to the grand jury, no adversary judicial proceedings against him had yet been initiated. See United States v. Gouveia, 467 U.S. 180, 187 (1984) ("[The Sixth Amendment] right to counsel attaches only at or after the initiation of adversary judicial proceedings against the defendant."). The Government's warnings to Teitjen regarding his Fifth Amendment rights do not show that a prosecution had commenced. Indeed, no indictment was returned against Tietjen until over one year after he testified to the grand jury. His Sixth Amendment right to counsel thus had not yet attached.

Tietjen further contends that his redacted grand jury testimony, read at trial, was not sufficiently complete under the "rule of completeness." Tietjen's grand jury testimony was redacted to remove all references to co-defendant Stanie Benz in order to comply with the rule in Bruton v. United States, 391 U.S. 123 (1968). Benz entered a plea on the day before trial and then testified against Tietjen. The redacted version of Tietjen's testimony nonetheless was introduced. However, the omitted portions of Tietjen's testimony were not necessary to avoid misleading the jury or to clarify or explain any portion of the admitted testimony, and the rule of completeness does not require the court to admit Tietjen's complete grand jury testimony solely because some portions might be exculpatory. See Wilkerson, 84 F.3d at 696. Moreover, Tietjen suffered no prejudice. Stanie Benz testified at trial, and Tietjen had full opportunity to cross examine her. The district court did not err.

IV. SENTENCING

The district court's factual findings underlying sentencing enhancements are reviewed for clear error. The district court's legal interpretations are reviewed de novo. United States v. Akinkoye, 185 F.3d 192, 201 (4th Cir. 1999), cert. denied, 528 U.S. 1177 (2000).

26

A. Two-Level Enhancement for Abuse of a Position of Trust

Both Bollin and Tietjen appeal the district court's application of a two-level enhancement under U.S.S.G. § 3B1.3 for abuse of a position of trust. Under § 3B1.3, a defendant's sentence is increased by two levels "if [the district court] determines that the defendant abused a position of trust and that abuse significantly contributed to the commission or concealment of the crime." Id. at 203; U.S.S.G. § 3B1.3. "Whether a defendant occupied a position of trust warranting a two-level enhancement under U.S.S.G. § 3B1.3 is a factual determination reviewable for clear error." United States v. Glymph, 96 F.3d 722, 727 (4th Cir. 1996).

Whether a defendant held a position of trust must be "approached from the perspective of the victim." United States v. Gordon, 61 F.3d 263, 269 (4th Cir. 1995). Thus, the § 3B1.3 adjustment may be applied "in a case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not." U.S.S.G. § 3B1.3, cmt. n.2; see also United States v. Queen, 4 F.3d 925, 929 (10th Cir. 1993) (holding that the § 3B1.3 enhancement may apply to imposters). In the case of an imposter, it is not merely the defendant's misrepresentation that justifies the § 3B1.3 enhancement. In every case of fraud, the defendant will have created confidence and trust in the victim. But fraud alone does not justify the enhancement. We must "carefully distinguish between those arms-length commercial relationships where trust is created by the defendant's personality or the victim's credulity, and relationships in which the victim's trust is based on the defendant's position in the transaction." United States v. Koehn, 74 F.3d 199, 201 (10th Cir. 1996). Section 3B1.3 penalizes defendants who take advantage of a position that provides them with the "freedom to commit a `difficult-to-detect wrong.'" United States v. Moore, 29 F.3d 175, 179 (4th Cir. 1994) (quoting United States v. Hill, 915 F.2d 502, 506 (9th Cir. 1990)).

Tietjen argues that he does not qualify for the § 3B1.3 enhancement because he did not have a trust relationship with the investors and because the enhancement may not be applied by imputing to him a co-conspirator's abuse of a position of trust. The district court applied the enhancement based on Tietjen's own abuse of a position

27

of trust; the court did not impute to him Benz's alleged abuse of a position of trust. See Moore, 29 F.3d at 179 (holding that one co-conspirator's abuse of a position of trust is not attributable to another co-conspirator). The district court found that Tietjen falsely held himself out as having a high level of skill and experience in debentures trading. Although it was Benz who actually solicited the investors, Tietjen caused the impression that he was a legitimate, experienced debentures trader to be passed on to the ultimate investors to induce them to invest. See Queen, 4 F.3d at 930 (affirming an enhancement under § 3B1.3 where the defendant caused his employees to hold him out as a legitimate investment advisor/broker). In entrusting Tietjen with their money, the investors provided Tietjen with the discretion to invest on their behalf and expected Tietjen to make trades in their best interest, which he did not do. See United States v. Davuluri, 239 F.3d 902, 909 (7th Cir. 2001) (noting that what distinguishes situations in which § 3B1.3 should apply is "whether the defendant has broad discretion to act on behalf of the victim and the victim believes the defendant will act in the victim's best interest"). The district court did not clearly err in finding that Tietjen had abused a position of trust justifying an enhancement under § 3B1.3.

Bollin also argues that the district court erred in applying the § 3B1.3 enhancement to him because he did not actually possess any specialized knowledge and did not actually assume a position of trust vis-a-vis the victims. The district court found that although Bollin may have lacked the specialized knowledge of an actual investment broker, Bollin represented that he knew about debentures trading programs, knew their track record, and had experience investing in them. Bollin held himself out as experienced in debentures trading and caused that impression to be extended to the ultimate investors. Bollin represented that he was the "broker" in the investment program, and the investors' funds were entrusted to him when they were transferred to his offshore trust account. Bollin demonstrated that, as far as the investors were concerned, he was vested with discretionary authority over their money when he falsely claimed to have "frozen" the funds in order to protect them. Bollin used his position as the "broker" in the transaction to lull the investors into delaying going to the authorities or suing to recoup their losses. Although Bollin also falsely represented that he was a co-investor in the debentures trading program, we cannot say the district court clearly erred in finding that Bollin

28

occupied and abused a position of trust justifying the § 3B1.3 enhancement.

B. <u>Two-Level Enhancement for Obstruction of Justice</u>

Tietjen contends that the district court erred by applying a two-level enhancement under U.S.S.G. § 3C1.1 for obstruction of justice. Because Tietjen failed to raise his objection at sentencing, we review for plain error. <u>See United States v. Kinter</u>, 235 F.3d 192, 199 (4th Cir. 2000), <u>cert. denied</u>, 121 S. Ct. 1393 (2001). The district court did not err. Tietjen was convicted of conspiracy to obstruct justice under 18 U.S.C. § 1503. The applicable Guideline for obstruction of justice is § 2J1.2. Note 3 of the § 2J1.2 Commentary provides: "In the event the defendant is convicted under this section as well as for the underlying offense (i.e., the offense that is the object of the obstruction), <u>see</u> the Commentary to Chapter Three, Part C (Obstruction), and to § 3D1.2(c) (Groups of Closely Related Conduct)." U.S.S.G. § 2J1.2, cmt. n.3. Tietjen argues that Note 7 of § 3C1.1 governs his sentence and precludes the enhancement. We disagree. Because Tietjen was also convicted of conspiracy to commit fraud and money laundering, the offenses with respect to which the obstruction conduct occurred, Note 8 governs. Note 8 provides:

> If the defendant is convicted both of an obstruction offense . . . and an underlying offense (the offense with respect to which the obstruction conduct occurred), the count for the obstruction offense will be grouped with the count for the underlying offense under subsection (c) of § 3D1.2 . . . . The offense level for that group of closely related counts will be the offense level for the underlying offense increased by the 2-level adjustment specified by this section. . . .

U.S.S.G. § 3C1.1, cmt. n.8. The enhancement for obstruction of justice was proper.

C. <u>Relevant Conduct</u>

Tietjen contends that the district court erred by using $2.4 million as the relevant conduct amount in the Guidelines calculations for

29

Counts One and Two. Tietjen objects to the inclusion of $1 million that he never actually received because the funds were returned to Benz by Dean Witter, who refused to complete the transfer.[17] Tietjen, however, expected to receive the $1 million from Benz. He did not actually receive the funds only because the bank refused to complete the transfer. The $1 million thus was properly attributed to Tietjen. Further, there is no error in the district court's calculation under Apprendi v. New Jersey, 530 U.S. 466 (2000), because Tietjen's sentence--60 months on Count One and 135 months on Count Two to run concurrently--did not exceed the statutory maximums. See 18 U.S.C. § 371 (maximum 5 years); 18 U.S.C. § 1956(a), (h) (maximum 20 years); Kinter, 235 F.3d at 199-200 (recognizing that the Apprendi holding is limited to factual determinations that increase the penalty for a crime beyond the prescribed statutory maximum, and holding that the prescribed statutory maximum is found by looking to the language of the statute criminalizing the offense). The district court did not err.

## D. $1.2 Million Forfeiture Judgment

Gormley contends that his $1.2 million forfeiture judgment violates the Excessive Fines Clause of the Eighth Amendment to the United States Constitution. This court considers de novo whether a forfeiture is a constitutionally excessive fine. United States v. Bajakajian, 524 U.S. 321, 336-37 (1998). The burden is on the party challenging the constitutionality of the forfeiture to demonstrate its excessiveness. United States v. Ahmad, 213 F.3d 805, 813 (4th Cir.), cert. denied, 121 S. Ct. 573 (2000). "[A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." Bajakajian, 524 U.S. at 334. To determine the proportionality of a forfeiture, a court should consider "the nature and extent of the criminal activity, its relation to other crimes, its penal-

_____

[17] Tietjen also objects to the inclusion of a $250,000 sum that was also returned to Benz by the bank. Because the threshold for the relevant conduct is $2 million, see U.S.S.G. § 2S1.1(b)(2)(G), and the district court attributed to Tietjen $2.4 million, only the $1 million sum could affect Tietjen's sentence. We therefore do not reach his challenge to the inclusion of the $250,000.

ties, and the harm it caused." Ahmad, 213 F.3d at 813; see also Bajakajian, 524 U.S. at 337-40.

Gormley argues that his $1.2 million forfeiture judgment is excessive under United States v. Van Brocklin, 115 F.3d 587 (8th Cir. 1997), in which the Eighth Circuit held that a forfeiture judgment of over $1.3 million against a defendant who played a secondary role in the fraudulent scheme violated the Excessive Fines Clause. Id. at 601-02. Gormley argues that his forfeiture judgment is excessive in light of his minor role in the money laundering activities, the small personal benefit that he received, approximately $30,000 in legal fees, and his lesser culpability compared to that of the other defendants.

In United States v. Bajakajian, the defendant pleaded guilty to failure to report exported currency in the amount of $357,144. 524 U.S. at 337. Although 18 U.S.C. § 982(a)(1) required forfeiture of the entire amount involved in the offense, the Supreme Court concluded that forfeiture of the entire $357,144 violated the Excessive Fines Clause because the amount of the forfeiture was grossly disproportional to the gravity of the defendant's offense. Id. The defendant's crime was "solely a reporting offense," and his violation was "unrelated to any other unlawful activities." Id. at 337-38. Although the maximum statutory sentence was five years and/or a $250,000 fine, the maximum sentence that could have been imposed on the defendant under the Sentencing Guidelines was six months and a $5,000 maximum fine, thus indicating a minimal level of culpability. Id. at 338. Moreover, the defendant caused only minimal harm, merely depriving the government of information, but causing no loss to the public fisc. Id. The gravity of the defendant's offense thus was low, while the amount of the forfeiture was very high. Id. at 339-40. The forfeiture of the entire $357,144 therefore violated the Excessive Fines Clause. Id. at 340.

After considering the factors set forth in Bajakajian, we are satisfied that Gormley's $1.2 million forfeiture judgment is not grossly disproportional to the gravity of his offense.[18] Unlike in Bajakajian,

_____

[18] Gormley's forfeiture was imposed under 18 U.S.C. § 982(a)(1), the same provision at issue in Bajakajian, and as part of his criminal sentence. Thus, there is no question that the forfeiture ordered against Gormley is punitive and therefore subject to analysis under the Excessive Fines Clause.

31

the nature of Gormley's criminal activity in this case was not merely a reporting violation. Gormley was involved in money laundering, and the money laundering arose out of and involved a continuing securities fraud scheme that defrauded multiple investors out of millions of dollars. See Ahmad, 213 F.3d at 817 (finding the defendant's reporting offense to be serious in part because it was part of a larger customs fraud scheme). The forfeiture judgment was not based on a single occurrence of money laundering. Instead, the defendants conducted multiple transactions over a period of nearly two years. Further, the statutory maximum for Gormley's offense was twenty years and/or a $500,000 fine, thus indicating that Congress has found the offense to be serious. See Bajakajian, 524 U.S. at 336 (noting that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature"). Under the Sentencing Guidelines, Gormley faced a sentence of ninety-seven to 121 months and a $500,000 fine. See U.S. Sent. Guidelines Manual, Sent. Table. Although the district court found Gormley eligible for a reduction in his sentence based on his "minor role" in the offense, the significant penalties Gormley faced demonstrate the gravity of his offense.

Moreover, although Gormley received only about $30,000, he is liable in a forfeiture judgment for the foreseeable criminal conduct of his co-conspirators. See United States v. McHan, 101 F.3d 1027, 1043 (4th Cir. 1996); United States v. Hurley, 63 F.3d 1, 22 (1st Cir. 1995); see also United States v. Gormley, 176 F.3d 476, 1999 WL 212008 (4th Cir. 1999) (per curiam) (unpublished) (affirming in Gormley's interlocutory appeal the district court's ruling that Gormley may be held jointly and severally liable for any forfeitable assets possessed by his co-defendants). As the First Circuit has noted, "holding a defendant liable for an amount of money foreseeably laundered by himself and his own co-conspirators is quite rational based on a proportionality analysis." Hurley, 63 F.3d at 23. In light of the extent of the money laundering, its relationship to the securities fraud scheme, and the harm caused, Gormley's $1.2 million forfeiture judgment is not excessive.

E. $783,545 in Restitution

Gormley contends that the order to pay restitution in the amount of $783,545 violates the Excessive Fines Clause based on the same argu-

ments that he raised regarding his forfeiture judgment. For the same reasons that Gormley's forfeiture judgment is not excessive, we find that the restitution order is not excessive.

Gormley also argues that remand is in order because the district court failed to make factual findings that Gormley has, or may have, an ability to pay restitution. Under the Victim and Witness Protection Act (VWPA), the sentencing court must make specific factual findings with respect to a defendant's financial resources, financial needs, and earning abilities before ordering restitution. See 18 U.S.C. § 3663(a) (1994); United States v. Karam, 201 F.3d 320, 329 (4th Cir. 2000). In his reply brief, Gormley suggests for the first time that the district court ordered restitution pursuant to the Mandatory Victims Restitution Act of 1996 (MVRA). The MVRA amended the VWPA by requiring sentencing courts to impose "full" restitution without considering the defendant's economic circumstances. See 18 U.S.C. §§ 3663A, 3664(f)(1)(A) (Supp. V 1999); Karam, 201 F.3d at 330. Under the VWPA, the court must first consider the defendant's financial situation before determining the amount of restitution to be paid. See 18 U.S.C. § 3664(a) (1994). Because Gormley's restitution was based on criminal activity that occurred before the MVRA's effective date, Gormley contends that application of the MVRA would violate the Ex Post Facto Clause of the United States Constitution.[19]

_____

[19] The MVRA provides that it "shall, to the extent constitutionally permissible, be effective for sentencing proceedings in cases in which the defendant is convicted on or after [April 24, 1996]." 18 U.S.C. § 2248, statutory notes. The circuits are split on whether applying the MVRA to criminal conduct committed before the MVRA's enactment violates the Ex Post Facto Clause. Compare United States v. Edwards, 162 F.3d 87 (3d Cir. 1998) (holding that applying the MVRA to criminal conduct committed before the MVRA's enactment violates the Ex Post Facto Clause); United States v. Siegel, 153 F.3d 1256, 1259-61 (11th Cir. 1998) (same); United States v. Williams, 128 F.3d 1239, 1241 (8th Cir. 1997) (same); United States v. Baggett, 125 F.3d 1319, 1322 (9th Cir. 1997) (same); United States v. Thompson, 113 F.3d 13, 15 n.1 (2d Cir. 1997) (same); with United States v. Nichols, 169 F.3d 1255, 1279-80 (10th Cir.) (holding that restitution is not criminal punishment for the purposes of the Ex Post Facto Clause), cert. denied, 528 U.S. 934 (1999); United States v. Newman, 144 F.3d 531, 538-40 (7th Cir. 1998) (same). This circuit has not yet decided the issue.

Assuming without deciding that the district court was required to apply the VWPA, Gormley failed to object to the district court's alleged failure to make the required findings at the time of sentencing. Because Gormley failed to object at sentencing, we review only for plain error.**20** See Karam, 201 F.3d at 330. We conclude that Gormley has failed to show that the alleged lack of factual findings prejudiced his rights in any way.

A sentencing court "satisfies its duty [under the VWPA] to make specific findings if it adopts a presentence report `that contains adequate factual findings to allow effective appellate review of the fine or restitution.'" Id. (quoting United States v. Castner, 50 F.3d 1267, 1277 (4th Cir. 1995)). The district court adopted the factual findings of Gormley's presentence report (PSR). The PSR indicates that Gormley is well-educated and industrious. Gormley obtained scholarships for his preparatory and college education. He worked his way through college and law school. Although Gormley likely will lose his law license as a result of his conviction and will no longer have earning potential as a lawyer, the loss of his license does not render him completely unable to earn a living, particularly because Gormley is well-educated, is in good health, and has no history of substance abuse. The PSR recommended that an installment plan be established so that Gormley could pay a restitution obligation, which the district court ordered. Moreover, Gormley does not explain how, or even whether, the district court's restitution order would have been different had the court made factual findings. See Castner, 50 F.3d at 1278 (noting that under the plain error standard, appellants bear the burden of proof with respect to prejudice of their rights); 18 U.S.C. § 3664(d) (1994) ("The burden of demonstrating the financial resources of the defendant and the financial needs of the defendant and such defendant's dependents shall be on the defendant."). The PSR contained sufficient

_____

**20** In order to correct plain error, four conditions must be met: (1) there must be an error; (2) the error must be plain, meaning obvious or, at a minimum, clear under current law; (3) the error must affect substantial rights; and (4) the reviewing court must determine if the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Olano, 507 U.S. 725, 736 (1993); see also Castner, 50 F.3d at 1277. "Appellants bear the burden of proof with respect to prejudice of their rights." Id. at 1278 (citing Olano, 507 U.S at 735).

facts to support the imposition of restitution. Gormley fails to demonstrate a probability that the amount of restitution would have been different had the court made specific findings regarding his ability to pay.

Gormley also argues that the district court violated the requirement in United States v. Johnson, 48 F.3d 806, 808-09 (4th Cir. 1995), that the district court retain authority over restitution orders. At sentencing, the district court ordered the full amount of restitution payable in monthly installments. The district court also ordered that Gormley's "ability to pay restitution will be reassessed by the probation officer after his release from custody. And if a modification is in order, report that modification to this Court for action." The court clearly stated that the probation officer should report to the court, but that the court would take any action. Thus, the court "retained both the right to review the probation officer's findings and to exercise ultimate authority regarding the payment of restitution." United States v. Dawkins, 202 F.3d 711, 717 (4th Cir.), cert. denied, 529 U.S. 1121 (2000). The district court did not improperly delegate its authority. Gormley's restitution order is affirmed.

F. Use of IRA Funds to Retain Appellate Counsel

Gormley's assets were subject to a restraining order that required him to obtain court permission for expenditures beyond ordinary living expenses. After he was convicted, Gormley asked the court for permission to spend $80,000 from his individual retirement account (IRA) to retain appellate counsel. Gormley argued that the funds in his IRA were protected from levy under Georgia law. The district court denied Gormley's request, holding that the funds in Gormley's IRA were potentially subject to forfeiture as substitute assets under 18 U.S.C. § 982(b)(1), which incorporates the substitute asset provision of 21 U.S.C. § 853(p), and that the protections for IRAs provided by Georgia law would not extend to IRA funds subject to criminal forfeiture. Gormley appeals the district court's denial of his motion. The district court's order is an order denying modification of an injunction, which we review for an abuse of discretion. See United States v. Snepp, 897 F.2d 138, 141 (4th Cir. 1990). We conclude that the district court did not abuse its discretion.

35

Gormley's forfeiture judgment was entered pursuant to 18 U.S.C. § 982(a)(1). Section 982(b)(1) incorporates the forfeiture provisions of 21 U.S.C. § 853. Under § 853(p), where the property initially subject to forfeiture is unavailable, the government may forfeit substitute assets:

> If any of the property described in subsection (a) of this section, as a result of any act or omission of the defendant--
>
> (1) cannot be located upon the exercise of due diligence;
>
> (2) has been transferred or sold to, or deposited with, a third party;
>
> (3) has been placed beyond the jurisdiction of the court;
>
> (4) has been substantially diminished in value; or
>
> (5) has been commingled with other property which cannot be divided without difficulty;
>
> the court shall order the forfeiture of any other property of the defendant up to the value of any property described in paragraphs (1) through (5).

21 U.S.C. § 853(p). In money laundering cases, § 982(b)(2) places a narrow limitation on the forfeiture of substitute assets by protecting against forfeiture a defendant who "acted merely as an intermediary who handled but did not retain" the laundered funds, unless the defendant conducted "three or more separate transactions involving a total of $100,000 or more in any twelve month period." 18 U.S.C. § 982(b)(2).

The Government has not yet moved to amend Gormley's forfeiture judgment to forfeit substitute assets. The order that Gormley appeals is an order leaving in place a restraining order under 21 U.S.C. § 853(e), not an order forfeiting Gormley's IRA funds. Under

36

§ 853(e), the district court may issue a restraining order to preserve the availability of the assets for forfeiture, "based on a finding of probable cause to believe that the assets are forfeitable." <u>United States v. Monsanto</u>, 491 U.S. 600, 615 (1989); 21 U.S.C.§ 853(e); <u>see also</u> <u>In re Billman</u>, 915 F.2d 916, 919 (4th Cir. 1990). The probable cause found by the grand jury satisfies the government's burden of proving the allegations of the indictment. <u>Id.</u> This court has held that the pretrial restraint provision of the RICO forfeiture statute, 18 U.S.C. § 1963(d), permits the restraint of substitute assets under § 1963(m) pending resolution of the defendant's case. <u>Id.</u> at 921. The restraint and substitute assets provisions of § 853 are identical to those in the RICO statute, and we see no reason to construe them differently. <u>See id.</u> (noting that "[§ 853] and RICO forfeiture statutes should be similarly construed"). Gormley's substitute assets thus were subject to restraint to preserve their availability for forfeiture pending the outcome of his case.

The jury found Gormley liable for forfeiture of $1.2 million, and the indictment included a notice to seek substitute assets.**21** There is probable cause to believe that at least a significant portion of the $1.2 million in laundered funds is no longer available; the funds were transferred to overseas accounts beyond the jurisdiction of the district court and were used to repay investors and other individuals. As a member of a conspiracy, Gormley is vicariously liable for the reasonably foreseeable conduct of his co-conspirators, both substantively and at sentencing. <u>See McHan</u>, 101 F.3d at 1042-43; <u>Hurley</u>, 63 F.3d at 23. His substitute assets thus may be subject to forfeiture in the event the laundered funds are determined to be unavailable. <u>See id.</u> (affirming the forfeiture of substitute assets where the defendants were held vicariously liable for a $136 million forfeiture based on the reasonably foreseeable money laundering activities of their co-conspirators). Gormley argues that he was merely an intermediary and is therefore entitled to the benefit of the safe harbor provided by

_____

**21** We reject Gormley's argument that his IRA is not subject to forfeiture because it was not included in the indictment's list of proposed substitute assets. The indictment did not purport to set out an exhaustive list of substitute assets, but instead set out a list"including but not limited to" certain identified assets. <u>See United States v. Moffitt, Swerling & Kemler, P.C.</u>, 83 F.3d 660, 664 (4th Cir. 1996).

§ 982(b)(2). Gormley did not raise this argument before the district court, however, and we decline to address it at this time. We leave it to the district court to address this argument and make the appropriate findings if and when the Government moves for an order to forfeit Gormley's substitute assets.

Gormley further argues, however, that the district court should have released his IRA funds because Georgia law insulates all but 25% of the funds from forfeiture. Under Georgia Code § 18-4-22, funds in an IRA are "exempt from the process of garnishment until paid . . . . Such funds or benefits, when paid . . ., shall be exempt from the process of garnishment only to the extent provided in Code Section 18-4-20 for other disposable earnings, unless a greater exemption is otherwise provided by law." Ga. Code Ann.§18-4-22. Section 18-4-20 limits the garnishment to 25%. Ga. Code Ann.§ 18-4-20. We have found no federal or state case applying § 18-4-22 to a criminal forfeiture, and Gormley provides no such authority. As the district court noted, the cases that address §§ 18-4-20 and 18-4-22 discuss shielding an IRA from a creditor attempting to collect a debt. See, e.g., Davis v. Davis, 288 S.E.2d 748 (Ga. Ct. App. 1982); Cooper v. Atlanta Policemen's Pension Fund, 249 S.E.2d 684 (Ga. Ct. App. 1978). Gormley's forfeiture judgment is not merely a debt, but is part of his criminal sentence. See 18 U.S.C.§ 982(a)(1) (instructing the court to order forfeiture of property involved in the offense "in imposing sentence" on a person convicted of a money laundering offense).

Moreover, under the Supremacy Clause of the United States Constitution, Georgia law could not insulate Gormley's assets from forfeiture to the extent that federal law provides otherwise. A state law is preempted to the extent that it conflicts with federal law. Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248 (1984). In making the determination of whether state law conflicts with federal law, "the test to apply is whether `it is impossible to comply with both state and federal law' or whether `the state law stands as an obstacle to the accomplishment of the full purposes and objectives' of the relevant federal law." National Home Equity Mortgage Ass'n v. Face, 239 F.3d 633, 637 (4th Cir. 2001) (quoting Silkwood, 464 U.S. at 248).

As noted above, a forfeiture under 18 U.S.C. § 982 is ordered as part of a defendant's sentence for a federal money laundering convic-

38

tion. See 18 U.S.C. § 982(a)(1). Federal sentencing laws supersede state laws that purport to place limits on a federal defendant's criminal sentence when federal law provides otherwise. See United States v. Daniels, 929 F.2d 128, 130 (4th Cir. 1991) (noting that under the Supremacy Clause, state law could not prevent consideration of juvenile proceedings by a federal court in determining a sentence, when federal law provides otherwise).

Further, under federal law, the funds in Gormley's IRA may be forfeited in their entirety. Section 982(a)(1) states that "any property, real or personal, involved in" the money laundering offense, without limitation or qualification, is subject to forfeiture. 18 U.S.C. § 982(a)(1) (emphasis added). The statute makes no allowance for property protected by state law. Similarly, the substitute assets provision provides that the court "shall order the forfeiture of any other property up to the value of" the initially forfeited property, in the event the original property is unavailable. 21 U.S.C. § 853(p) (emphasis added); 18 U.S.C. § 982(b)(1). Congress requires the forfeiture of any other property as substitute assets and again makes no allowance for protections offered under state law. Cf. United States v. Lot 5, 23 F.3d 359, 363 (11th Cir. 1994) (holding that because 21 U.S.C. § 881(a)(7) makes no exception for property protected by state law, the Florida homestead exemption does not protect real property from forfeiture under federal law). As this court has recognized, the substitute assets provision in § 853(p) "was enacted to make the government's forfeiture efforts more effective." United States v. Moffitt, Swerling & Kemler, P.C., 83 F.3d 660, 669 (4th Cir. 1996). Because Georgia law would insulate all but 25% of a defendant's IRA funds from forfeiture while federal law provides for full forfeiture, Georgia law conflicts with federal law and "stands as an obstacle to the accomplishment of the full purposes and objectives" of the federal money laundering forfeiture laws.

Although state law "has traditionally been relied upon to resolve questions of property rights and interests arising under [the forfeiture laws]," once a defendant's property interest has been identified, federal forfeiture law determines whether the property may be forfeited. Id. at 670; accord United States v. Dicter, 198 F.3d 1284, 1290 (11th Cir. 1999) (holding that 21 U.S.C. § 853(a) applies "irrespective of any provision of state law"), cert. denied, 121 S. Ct. 77 (2000);

39

<u>United States v. 18755 North Bay Road</u>, 13 F.3d 1493, 1498 (11th Cir. 1994) (holding that federal forfeiture law preempts the Florida homestead exemption); <u>United States v. Curtis</u>, 965 F.2d 610, 616 (8th Cir. 1992) (holding that § 853(a) supersedes the Iowa homestead exemption); <u>see also United States v. Rodgers</u>, 461 U.S. 677 (1983) (holding that federal tax collection laws supersede state homestead laws); <u>United States v. Allen</u>, 247 F.3d 741, 794 (8th Cir. 2001) ("[W]e think the legal principles are clear that state law determines whether a property interest exists in the first instance, but federal law determines whether and how that property may be attached."). Indeed, to hold otherwise would virtually destroy the uniformity of application of the money laundering forfeiture laws and would interfere with Congress' intent. <u>See Curtis</u>, 965 F.2d at 616-17. We conclude that federal forfeiture law supersedes Georgia's statutory protections for IRAs. The district court did not abuse its discretion in declining to modify its restraining order.

V. <u>CONCLUSION</u>

For the foregoing reasons, we affirm the convictions and sentences of appellants Gormley, Bollin, and Tietjen. We also affirm the district court's order denying Gormley permission to spend funds from his IRA pending the outcome of his case.

<u>AFFIRMED</u>

40